## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

FRANCISCO JAVIER ZAVALA
MARTINEZ, RENE MEZA QUIRINO,
CARLOS GIOVANNI PEREZ CASTRO,
LUIS ADRIAN PEREZ GARCIA, and
VICTOR HUGO MAXIMO DIAZ,

    *Plaintiffs*,

    v.

MANZANA, LLC; N. CASERTANO
GREENHOUSES & FARMS, INC.;
LAWRENCE WILLIAMS; and JOHN
CASERTANO,

    *Defendants*.

**No.**

## <u>COMPLAINT</u>

Defendants Manzana, LLC and Lawrence Williams have long operated a farm labor contractor business that takes unfair advantage of the H-2A temporary worker program to traffic and exploit migrant workers from Mexico—including Plaintiffs Francisco Javier Zavala Martinez, Rene Meza Quirino, Carlos Giovanni Perez Castro, Luis Adrian Perez Garcia, and Victor Hugo Maximo Diaz—for their own financial gain. Beginning as early as 2019, Manzana and Williams entered into a business venture with Defendants John Casertano and N. Casertano Greenhouses & Farms, Inc., a farm and wholesale nursery in Cheshire, Connecticut, to recruit Plaintiffs to labor for Defendants. Instead of providing adequately-paid jobs as required by law, Defendants have knowingly and systematically abused the H-2A program, forcing Mexican migrant workers into a cycle of dependence and forced labor. By using implicit and explicit threats to create an atmosphere of fear and domination, Defendants conspired to compel

1

Plaintiffs to return to Connecticut year after year. Defendants have directly benefited from this scheme by obtaining a cheap, continuous, and reliable workforce. In short, Defendants flouted federal and state law by exploiting the needs and vulnerabilities of indigent Mexican workers for financial gain. Plaintiffs bring this class action to demand accountability, both for themselves and all similarly situated workers who endured Defendants' abuses.

H-2A workers are uniquely vulnerable to exploitation because the program directly ties their immigration status to a single job, and their employers also control the workers' housing. The program transports economically vulnerable workers to worksites far from home, where they are often geographically, socially, and linguistically isolated, and are always heavily reliant on their employer-landlord. Unsurprisingly, the program is rife with abuse, as the U.S. Department of Labor and numerous watchdog organizations have long recognized.

Defendants Manzana and its owner Williams have been sued at least twice in recent years for systemic abuse of the H-2A program, including failure to pay H-2A workers the wages guaranteed by their contracts, fraudulent promises, and national origin discrimination. Together with Defendants Casertano Greenhouses and its owner John Casertano, Defendants Manzana and Williams have engaged in a general business practice and pattern of severe exploitation, and knowingly provided and obtained forced labor from Plaintiffs through abuse of the H-2A program. Since at least October 2023, the Department of Labor has been investigating Defendants' unlawful practices.

Plaintiffs now bring this action individually and on behalf of all workers similarly situated under the Trafficking Victims Protection Reauthorization Act to hold Defendants accountable for forced labor, trafficking, and conspiracy. Plaintiffs also bring this action

individually under the Fair Labor Standards Act, Connecticut common law for breach of contract and conversion, and Connecticut's statutory theft statute.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 216(b), and 18 U.S.C. § 1595(a), and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), as this action is between citizens of a State and citizens of a foreign state, and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) because at all times relevant to this Complaint, regular and substantial business activities of all Defendants occurred in Connecticut, and a substantial part of the events or omissions giving rise to the Plaintiffs' claims were committed within the District of Connecticut.

## PARTIES

3.      Plaintiff Francisco Javier Zavala Martinez ("Mr. Zavala") was employed by Defendants from about February 2021 to August 2024. He is a citizen of Mexico and resides in Texas.

4.      Plaintiff Rene Meza Quirino ("Mr. Meza") was employed by Defendants from about April 2020 to September 2024. He is a citizen of Mexico and resides in Pennsylvania.

5.      Plaintiff Carlos Giovanni Perez Castro ("Mr. Perez Castro") was employed by Defendants from about March 2022 until August 2024. He is a citizen of Mexico and resides in Texas.

6.     Plaintiff Luis Adrian Perez Garcia ("Mr. Perez Garcia") was employed by Defendants from about March 2022 to November 2024. He is a citizen of Mexico and resides in Florida.

7.     Plaintiff Victor Hugo Maximo Diaz ("Mr. Maximo") was employed by Defendants from about May 2019 to September 2024. He is a citizen of Mexico and resides in Pennsylvania.

8.     At all times relevant to this Complaint, Plaintiffs were admitted to the United States under the H-2A temporary foreign worker visa program, 8 U.S.C. § 1101(a)(15)(H)(ii)(a), administered in part by the U.S. Department of Labor (DOL).

9.     At all times relevant to this Complaint, Plaintiffs were employees of the Defendants within the meaning of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(e)(1).

10.     At all times relevant to this Complaint, Plaintiffs were employed by Defendants within the meaning of the FLSA, 29 U.S.C. § 203(g).

11.     At all times relevant to this Complaint, Plaintiffs were engaged in commerce or in the production of goods for commerce, or were employed in an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of 29 U.S.C. § 203(s)(1)(A) of the FLSA.

12.     Defendant Manzana, LLC, ("Manzana") is a farm labor contractor. It is a limited liability company registered in the State of Michigan. Its registered address of business is 395 Gooding St, Conklin, MI 49403. It regularly conducts business in Connecticut.

13.     Upon information and belief, Defendant Manzana had an annual gross volume of sales or business of at least $500,000 at all times relevant to this Complaint.

14.    Defendant Lawrence Williams is the founder and chief executive officer of Manzana. In that capacity, he regularly conducts business in Connecticut. Upon information and belief, he resides in Michigan.

15.    Defendant N. Casertano Greenhouses & Farms, Inc. ("Casertano Greenhouses") is a wholesale nursery and farm. It is a corporation registered in the State of Connecticut. Its principal place of business is 1030 S. Meriden Rd., Cheshire, CT 06410.

16.    Upon information and belief, Defendant Casertano Greenhouses had an annual gross volume of sales or business of at least $500,000 at all times relevant to this Complaint.

17.    Defendant John Casertano is the president and chief executive officer of Casertano Greenhouses. Upon information and belief, he resides in Connecticut.

18.    Defendants Manzana, Casertano Greenhouses, Williams, and John Casertano are associated in fact, are engaged in a continuous business relationship, and comprise a venture as that term is used in 18 U.S.C. §§ 1589, 1590, 1594, and 1595.

## BACKGROUND: THE H-2A PROGRAM

19.    Under the H-2A program, an agricultural employer in the United States may bring foreign workers to the country to perform labor of a temporary, agricultural nature if the U.S. DOL certifies (1) there are insufficient available workers within the United States to perform the job; and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly situated U.S. workers. 8 U.S.C. § 1188. Foreign workers admitted under this program are commonly known as "H-2A workers."

20.    The H-2A program was created as a consequence of the United States' demand for inexpensive migrant labor. In the mid-twentieth century, the "bracero" program brought millions of Mexican workers across the southern border for seasonal work. The program was

plagued by rampant abuse.[1] A DOL official supervising the program referred to it as "legalized slavery."[2] Congress ended the program in 1964, but to satisfy demands for cheap, migrant labor, it left in place the H-2 guestworker visa program. Congress later created the H-2A visa—specifically for agricultural workers—in 1986.

21.    Temporary agricultural workers recruited under the H-2A program suffer from many of the same abuses as the bracero program. Migrants leave dire conditions in their home countries only to be shortchanged and overworked by employers who take advantage of the limited protections available to H-2A workers.[3]

22.    Furthermore, H-2A agricultural workers do not receive the full protection of United States federal employment and labor laws—a relic of this nation's racist past. For example, passage of the FLSA during the New Deal era was made possible by bowing to Southern Democrat demands that the statute include race-neutral language to exclude non-white workers from certain wage and hour protections.[4] As such, although H-2A agricultural workers are now protected by the minimum wage provisions of the FLSA, they remain exempt from federal overtime provisions except in certain circumstances.

23.    To participate in the H-2A program, an employer must first submit to DOL an "Agricultural Clearance Order" or "job order," describing the position for which the employer seeks workers.

---

[1] *See, e.g.*, Sylvia Woodmansee, *Invisible Hands: Forced Labor in the United States and the H-2 Temporary Worker Visa Program*, 111 CALIF. L. REV. 1223, 1228–31 (discussing history of the H-2A program).
[2] PATRICK H. MOONEY & THEO J. MAJKA, FARMERS' AND FARM WORKERS' MOVEMENTS: SOCIAL PROTEST IN AMERICAN AGRICULTURE 152 (1995).
[3] SOUTHERN POVERTY LAW CENTER, CLOSE TO SLAVERY: GUESTWORKER PROGRAMS IN THE UNITED STATES 4–5 (2013), https://perma.cc/AP88-VXUM.
[4] *See, e.g.*, Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural and Domestic Worker Exclusion from the National Labor Relations Act*, 72 OHIO ST. L.J. 95, 99, 114–17 (2011) (describing "compromise position" of New Deal legislation, including the FLSA).

24.    H-2A job orders cite to and incorporate by reference the H-2A program regulation requirements. 20 CFR § 655.122(q). These H-2A job orders are enforceable employment contracts that bind H-2A recruiters and agricultural employers alike. *Id.* A copy of the H-2A contract must be provided to the employee in a language understood by the worker. *Id.*

25.    Each H-2A contract contains job offer information (including wage and hours); minimum job qualifications and requirements; place of employment information; housing information; information regarding transportation, provision of meals, and daily subsistence; referral and hiring instructions; and additional material terms and conditions of the job offer.

26.    H-2A employers must pay H-2A workers at least the Adverse Effect Wage Rate (AEWR), a minimum hourly rate for work performed, which is set by the DOL. 20 C.F.R. § 655.120(a)(1)(i). The AEWR is set each year, is higher than the federal minimum wage, and differs by state. 20 C.F.R. § 655.120(b).[5]

27.    Federal regulations require H-2A employers to provide for, pay for, or reimburse H-2A workers for reasonable transportation and subsistence costs incurred by the worker during travel to and from the place of employment in the United States. 20 C.F.R. §§ 655.122(h)(1)–(2).

28.    Federal regulations require H-2A employers to pay or reimburse H-2A workers a minimum daily subsistence amount for meal costs incurred during their travel to and from the United States.[6] 20 C.F.R. §655.173(a). Employers must also reimburse workers for receipted

---

[5] For the time period relevant to this Complaint, the AEWR for Connecticut was and is as follows: Effective January 9, 2019: $13.25 per hour. 83 Fed. Reg. 66306; Effective January 2, 2020: $14.29 per hour. 84 Fed. Reg. 69774; Effective February 23, 2021: $14.99 per hour. 86 Fed. Reg. 10996; Effective December 29, 2021: $15.66 per hour. 86 Fed. Reg. 71282; Effective January 1, 2023: $16.95 per hour. 87 Fed. Reg. 77142; Effective January 1, 2024: $17.80 per hour. 88 Fed. Reg. 86677.

[6] For the time period relevant to this Complaint, the minimum daily subsistence amounts are as follows: Effective March 21, 2018: $12.26 per day. 83 Fed. Reg. 12140; Effective March 22, 2019: $12.46 per day. 84 Fed. Reg. 10838; Effective March 20, 2020: $12.68 per day. 85 Fed. Reg. 16133; Effective March 10, 2021: $13.17 per day. 86 Fed. Reg. 13756; Effective February 23, 2022: $14.00 per day. 87 Fed. Reg. 10246; Effective February 9, 2023: $15.46 per day. 88 Fed. Reg. 8478; Effective February 13, 2024: $15.88 per day. 89 Fed. Reg. 1010.

meal costs incurred during their travel to and from the United States, up to a daily maximum.[7] *Id.*

29.     An H-2A employer must provide for or secure housing at no cost to H-2A workers. 20 C.F.R. § 655.122(d). Housing must comply with applicable with local, state, and/or federal standards and be sufficient to house the number of workers the employer requests through the program. *Id.*; *see also* 20 C.F.R. § 653.501(c)(3)(vi).

30.     An H-2A employer must provide workers' compensation insurance coverage in compliance with state law covering injury and disease arising out of and in the course of a worker's employment. 20 C.F.R. § 655.122(e)(1).

31.     H-2A workers are generally exempt from federal maximum hour, or overtime, protections under the FLSA because they are employed in agriculture. *See* 29 U.S.C. § 213(b)(12).

32.     Agricultural work under the FLSA includes primary and secondary agriculture, encompassing both the cultivation and processing of crops. 20 C.F.R. § 780.128. Nursery employees are employed in "agriculture" when they handle, sort, grade, trim, and pack products grown by their employer. 29 C.F.R. §§ 780.205, 780.209. However, nursery employees are not employed in agriculture when they handle or process the products of other growers. 29 C.F.R. § 780.209.

33.     The H-2A regulations require employers to pay workers with the frequency stated in the H-2A contract. 20 C.F.R. §655.122(m). Additionally, the FLSA requires that payment to workers not be delayed for a period longer than is reasonably necessary for the employer to

---

[7] For the time period relevant to this Complaint, the maximum daily subsistence amounts with receipts are as follows: Effective March 21, 2018: $51.00 per day. 83 Fed. Reg. 12140; Effective March 22, 2019: $55.00 per day. 84 Fed. Reg. 10838; Effective March 20, 2020: $55.00 per day. 85 Fed. Reg. 16133; Effective March 10, 2021: $55.00 per day. 86 Fed. Reg. 13756; Effective February 23, 2022: $59.00 per day. 87 Fed. Reg. 10246; Effective February 9, 2023: $59.00 per day. 88 Fed. Reg. 8478.

compute and arrange for payment of the amount due. 29 U.S.C. § 206(b); *see also Rogers v. City of Troy, N.Y.*, 148 F.3d 52, 55 (2d Cir. 1988).

## STATEMENT OF FACTS

***Defendants' Shared Business Venture***

34.     Upon information and belief, Defendants Casertano Greenhouses and John Casertano contracted with Defendants Manzana and Williams to recruit H-2A workers, including Plaintiffs and similarly situated workers, to perform agricultural work on their farms.

35.     Per the H-2A contracts entered into by Defendants, H-2A workers are hired to complete nursery work, which includes tending to plants and flowers, caring for young trees, pulling weeds, and cleaning equipment.

36.     Defendant Manzana is a federally licensed labor contractor operating in at least ten states with over 1,600 employees. Defendant Manzana describes itself as having "vast knowledge and expertise" as an H-2A labor contractor.[8]

37.     Defendant Casertano Greenhouses is a farm and wholesale plant nursery, where plants are propagated and grown to a desired size to be sold to retail nurseries and commercial gardeners. Defendant Casertano Greenhouses provides garden centers with "ground covers, perennials, grasses, annuals, wreaths, roping, and a broad array of decorated Christmas products."[9] Defendant Casertano Greenhouses describes itself as having a "Second Season" in the fall, during which it boasts being "one of the largest providers in the country of outdoor Christmas décor."[10] In Defendant Casertano Greenhouses' words, it is a business where "the family atmosphere is palpable."[11]

---

[8] MANZANA, https://perma.cc/59NG-CQD6 (last accessed Dec. 2, 2024).
[9] *About Us,* N. CASERTANO GREENHOUSES & FARMS, https://perma.cc/7Q3D-H5X2 (last accessed Dec. 2, 2024).
[10] *Id.*
[11] *Id.*

38.    Upon information and belief, Defendant John Casertano oversees Defendant Casertano Greenhouses' operations and possesses and exercises the ultimate authority to hire, fire, and set the pay and work schedules of H-2A workers, including Plaintiffs.

39.    Upon information and belief, Defendant Lawrence Williams oversees Defendant Manzana's operations and possesses and exercises the ultimate authority to hire, fire, and set the pay and work schedules of H-2A workers, including Plaintiffs.

40.    Except for where explicitly noted, Plaintiffs and similarly situated workers primarily worked on property owned by Defendants Casertano Greenhouses and John Casertano at all times relevant to this Complaint.

41.    Plaintiffs and similarly situated workers used tools and equipment owned by Defendants Casertano Greenhouses and John Casertano in their work, including a forklift and tractor.

42.    Upon information and belief, several Plaintiffs and similarly situated workers lived on property owned by Defendants Casertano Greenhouses and John Casertano during the course of their employment.

43.    Plaintiffs and similarly situated workers were supervised by and regularly received orders from individuals who, upon information and belief, were employed by Defendants Manzana and Casertano Greenhouses.

44.    At all times relevant to this Complaint, Luis Enrique Reyes Silva ("Supervisor Reyes") and Jose Saul Serrato Lopez ("Supervisor Serrato") acted as agents for all Defendants. Supervisors Reyes and Serrato supervised Plaintiffs' and other similarly situated workers' work at Defendant Casertano Greenhouses' properties and worked to meet recruitment quotas set by Defendants.

45.    Upon information and belief, Supervisors Reyes and Serrato were employees of Defendant Manzana at all times relevant to this Complaint, and their job responsibilities included recruiting workers in Mexico for employment with Defendants, collecting information from prospective employees to assist with H-2A visa processing, coordinating transportation to and from Mexico to the Defendants' worksite, supervising H-2A employees' work on the worksites, conveying information and directives from Defendants to all H-2A employees, collecting payments from H-2A employees, and distributing paychecks.

46.    In connection with work done at Defendant Casertano Greenhouses, Defendants Manzana and Williams acted as agents for Defendants Casertano Greenhouses and/or John Casertano at all times relevant to this complaint.

***Defendants Recruited Plaintiffs in Mexico and Forced Them to Pay for Inbound Travel***

47.    Defendants recruited Plaintiffs and similarly situated workers in their hometowns in Mexico through their employee agents. Supervisor Reyes recruited Plaintiffs Zavala, Perez Garcia, and Perez Castro in the state of Aguascalientes, Mexico. Supervisor Serrato recruited Plaintiff Meza in the state of Veracruz, Mexico. Plaintiff Maximo was recruited in Mexico City, Mexico by a former agent of Defendants.

48.    Upon information and belief, Supervisor Reyes resides in Aguascalientes when he is not employed in the United States. Upon information and belief, Supervisor Reyes has several relatives who are also employed by and/or are agents of Defendants and also reside in Aguascalientes when not employed in the United States. Upon information and belief, Defendant Manzana employs Supervisor Reyes's cousin in Manzana's main offices in Conklin, Michigan.

49.    Upon information and belief, Supervisor Serrato resides in Guanajuato, Mexico when he is not employed in the United States. Upon information and belief, Supervisor Serrato

has several relatives who are also employed by and/or are agents of Defendants and also reside in Guanajuato when not employed in the United States.

50.     Following recruitment by Defendants, Plaintiff Maximo began work for Defendants in 2019; Plaintiff Meza began work in 2020; Plaintiff Zavala began work in 2021; and Plaintiffs Perez Castro and Perez Garcia began work in 2022.

51.     At the time Plaintiffs and those similarly situated were recruited, Defendants provided little to no information about costs they would incur in the course of their recruitment, the nature of the work they would do, where they would be taken, and what the conditions there would be. Plaintiffs understood they were being recruited to perform agricultural work in the United States.

52.     Plaintiffs and those similarly situated agreed to take the job out of extreme economic necessity because they did not have other employment options to provide basic necessities for themselves and their families. Supervisors Reyes and Serrato, who themselves resided in the same or nearby towns as the H-2A workers they recruited, knew or should have known that the H-2A workers they recruited, including Plaintiffs, were economically vulnerable.

53.     Each year, Plaintiffs and those similarly situated followed a similar route from their hometowns in Mexico to the farms in Connecticut. At the start of each season, Supervisors Reyes and Serrato instructed Plaintiffs to take buses from their hometowns to Monterrey, Nuevo León, Mexico. Plaintiffs paid out-of-pocket for this transportation and spent between 11 and 15 hours on buses, traveling between 400 to 600 miles from their respective hometowns to reach Monterrey.

54.     Once in Monterrey, Plaintiffs and those similarly situated were instructed by Supervisors Reyes and Serrato to meet with "la licenciada." "La licenciada" acted as an agent of

Defendants in obtaining H-2A visas for all workers and organizing transportation and hotels each year.

55.     In Monterrey, "la licenciada" instructed the workers to complete the necessary paperwork for the H-2A visas.

56.     After approximately two to four days in Monterrey, "la licenciada" organized transportation to Nuevo Laredo, Tamaulipas, Mexico, a town near the Texas-Mexico border, where the H-2A workers would wait for their visas.

57.     Before leaving Monterrey, Supervisors Reyes and Serrato demanded Plaintiffs and those similarly situated to pay "la licenciada" for "visa photographs" and the bus from Monterrey to Nuevo Laredo. In 2021 and 2022, Supervisors Reyes and Serrato also demanded the H-2A workers pay "la licenciada" for mandatory COVID-19 tests. Supervisors Reyes and Serrato collected cash from the H-2A workers on behalf of "la licenciada" for costs associated with the visa photographs, transport to Nuevo Laredo, and, in applicable years, COVID-19 tests.

58.     Plaintiffs and similarly situated workers spent approximately three days in Nuevo Laredo, waiting for the U.S. consulate to issue their visas.

59.     Upon information and belief, "la licenciada" also chose and booked the hotels where Plaintiffs and other workers stayed in Monterrey and Nuevo Laredo.

60.     From Nuevo Laredo, Plaintiffs and other H-2A employees then traveled to Connecticut by a third bus, provided by Defendants. In 2019, 2020, 2021 and 2022, Plaintiffs first traveled to Defendant Manzana's main offices in Michigan before reaching Connecticut; in 2023 and 2024, they traveled directly to Connecticut. In each year of work, travel from Nuevo Laredo to Connecticut lasted approximately three days.

61.     Defendants paid for lodging along the inbound route, starting in Monterrey. However, Plaintiffs and other H-2A employees paid for their own subsistence costs from the moment they left their hometowns until they reached Connecticut, approximately ten days and between 2,500 and 2,800 miles later.

62.     Once in the United States, either at Defendant Manzana's offices in Michigan or in Connecticut, Defendants provided Plaintiffs and other H-2A employees with a nominal check. This check failed to fully reimburse Plaintiffs and other similarly situated workers for their expenses incurred in traveling to the worksite, including travel, daily subsistence, visa-related costs, and in applicable years, COVID-19 tests.

63.     Defendants never requested or instructed that Plaintiffs save receipts associated with their subsistence costs to ensure reimbursement up to the daily maximum.

64.     To cover these unreimbursed costs, and because Defendants would not issue their first paycheck for several weeks, several Plaintiffs were forced to take out high-interest loans worth hundreds of dollars before traveling to Connecticut.

65.     Defendants knew or should have known that Plaintiffs and other similarly situated workers would incur debt as a consequence of Defendants' non-reimbursement of inbound transportation costs.

### *Defendants Formed Binding H-2A Contracts with Plaintiffs but Failed to Provide Plaintiffs with Spanish-Language Copies*

66.     Once in the United States, either at Defendant Manzana's offices in Michigan or in Connecticut, Defendants required Plaintiffs and other H-2A employees to sign a copy of their H-2A contracts for that season.

67.    Defendants provided Plaintiffs and similarly situated workers with an English-language version of the H-2A contract to sign. Defendants did not provide a Spanish translation of the H-2A contract, nor did they explain the contents of the documents in Spanish. As monolingual Spanish speakers, Plaintiffs and those similarly situated did not understand the contents of the documents that they signed.

68.    Defendants exploited Plaintiffs' and similarly situated workers' limited education, familiarity with the English language, and knowledge of U.S. law and the H-2A program regulations. By only providing Plaintiffs and similarly situated workers with English-language versions of their job orders for each work year, Defendants prevented Plaintiffs and similarly situated workers from accessing essential information regarding their legal rights.

69.    In several instances, Defendants failed to provide some Plaintiffs with copies of the H-2A contracts to keep for their records. Defendants also prohibited some Plaintiffs from taking photos of the document with their phones.

***Defendants' Delayed Payment Scheme Forced Plaintiffs to Keep Laboring to Pay off Debts and Additional Costs***

70.    For the time period relevant to this Complaint, Defendant Manzana systematically failed to pay Plaintiffs and other H-2A employees on time.

71.    At the start of each season, Plaintiffs were only issued their first paycheck after two weeks of work. This first paycheck only reflected one week's worth of wages. Thus, Defendants were consistently behind in paying Plaintiffs and other H-2A employees. Defendants referred to this as keeping a "cheque de fondo," or a "background check." At the end of the season, Plaintiffs received two checks, for the prior two weeks' worth of wages, at once.

72. Because Defendants failed to fully reimburse Plaintiffs and similarly situated workers for inbound transportation costs, this subsequent withholding of Plaintiffs' wages meant that Plaintiffs could not begin paying off their loans immediately upon working, and this resulted in Plaintiffs' loans accruing interest.

73. Under these circumstances, Defendants further compelled Plaintiffs and similarly situated workers to labor to avoid the serious harm of not being able to pay off significant debts they had accrued.

74. In addition, Defendants' failure to pay Plaintiffs and similarly situated workers on time frustrated and delayed their ability to send home money to their families.

***Defendants Failed to Pay Plaintiffs Overtime Wages During Weeks in Which They Performed Non-Agricultural Work***

75. In general, Plaintiffs and other H-2A employees performed the nursery work they were contracted to perform, which included tending to plants and flowers, caring for young trees, pulling weeds, and cleaning equipment.

76. In the weeks before Mother's Day every season in which Plaintiffs worked on farms owned by Defendants Casertano Greenhouses and John Casertano, Plaintiffs and similarly situated workers packed and prepared orders of flowers and plants for distribution to stores. Upon information and belief, during this busy season, flowers and plants that Plaintiffs and other H-2A employees handled and packed were not grown by Defendant Casertano Greenhouses and instead were imported from other farms. This labor by Plaintiffs and other H-2A employees constituted non-agricultural work.

77. From late September to December every season in which Plaintiffs worked on farms owned by Defendants Casertano Greenhouses and John Casertano, Plaintiffs and similarly

16

situated workers assembled Christmas decorations with pine branches not grown by Defendant Casertano Greenhouses. Plaintiffs and other H-2A employees also added ribbon and other decorative elements from outside the farm to these arrangements and prepared them to be shipped to other stores for sale. This labor by Plaintiffs and other H-2A employees constituted non-agricultural work.

78.     Both in the weeks before Mother's Day and from late September to December, when engaged in non-agricultural work, Plaintiffs and other similarly situated workers frequently worked between nine and ten hours per day, approximately six days a week. Defendants did not pay Plaintiffs overtime wages for hours worked beyond 40 hours during these workweeks.

79.     Several Plaintiffs observed that Supervisors Reyes and Serrato gave preferential treatment to their family members, including, but not limited to, assigning them easier tasks on the farm and giving them additional hours when work was slow.

***Defendants Made Threats of Withdrawing H-2A Status that Forced Plaintiffs to Live and Work Under Unlawful and Restrictive Conditions***

80.     Defendants created an atmosphere of fear by leveraging threats that if Plaintiffs and other similarly situated workers did not comply with Defendants' demands, they would be fired and/or not brought back the following year. Since H-2A workers' lawful immigration status is specifically tied to their employer, such threats carried the additional implicit threat of withdrawing workers' H-2A status, exposing them to the threat of deportation by immigration authorities if they were to remain in the United States.

81.     Defendants' threats had their intended effect. All Plaintiffs and similarly situated workers generally complied with Defendants' demands while working for them. For example, through these threats, Defendants forced several Plaintiffs and other H-2A employees to work

under dangerous conditions, including operating machinery that Defendants did not train H-2A employees at Casertano Greenhouses to use safely.

82.     On several occasions, Defendants instructed Plaintiffs Zavala, Meza, Perez Castro, and Perez Garcia to operate a forklift without a forklift certification as required by the Occupational Safety and Health Administration (OSHA). Defendants failed to provide any training to these Plaintiffs on how to operate the forklift safely and the manner in which they used the forklifts put themselves and other H-2A workers at risk of severe bodily injury. Defendants also instructed Plaintiff Maximo to operate a tractor without any training on how to operate it safely.

83.     Throughout their employment with Defendants, Plaintiffs and other H-2A workers resided in substandard housing provided or secured by Defendants as required by Plaintiffs' H-2A contracts and federal regulations.

84.     Plaintiffs and similarly situated workers were compelled to labor for Defendants despite deplorable housing conditions in order to avoid incurring the serious harm of being without the means to pay their living expenses in a foreign state.

85.     The primary housing unit for workers employed by Defendants is located at 344 E. Johnson Ave., Cheshire, CT 06410. Plaintiffs Zavala, Perez Castro, Perez Garcia, and Maximo primarily resided in this housing unit throughout their employment with Defendants. In total, between 160 and 200 workers lived together at the 344 E. Johnson Ave. housing unit.

86.     Supervisor Reyes resided with Plaintiffs at 344 E. Johnson Ave.

87.     The 344 E. Johnson Ave. housing unit had two floors. Upstairs, Plaintiffs and other H-2A workers slept in cramped bunkbeds spaced a few feet apart throughout one large room separated by free-standing barriers. Approximately 16 workers slept in each area. Workers

draped sheets, cardboard, or plastic trash bags over their beds for privacy. When there were insufficient beds for all the workers, some workers slept on inflatable mattresses on the floor. There were two private bathrooms and storage lockers upstairs. The lockers had enough space to hang a few items of clothing and to keep essential toiletries. When Plaintiffs and other H-2A workers needed additional storage space, they purchased plastic bins or stored their belongings across narrow corridors between or under the bunk beds.

88.     Downstairs, there was a single bathroom and kitchen. The bathroom had approximately 12 toilet stalls and 12 shower stalls.

89.     During the 2021, 2022, and 2023 seasons, Plaintiff Meza resided in a building located at 1086 S. Meriden Rd., Cheshire, CT 06410. Upon information and belief, this housing unit is owned by Defendants Casertano Greenhouses and John Casertano. In total, about 18 workers including Supervisor Serrato lived together at the 1086 S. Meriden Rd. housing unit.

90.     The 1086 S. Meriden Rd. housing unit had two floors. Upstairs, approximately ten workers slept in twin-sized beds. There was one bathroom with a single toilet and single shower.

91.     In addition, the first floor had a kitchen with two stoves, but only two burners worked properly while Plaintiff Meza lived in the home.

92.     Plaintiff Meza slept on the basement level on a twin-sized bed in a room with approximately six other workers. The beds were spaced approximately three feet apart. Two other workers slept in an adjacent room on the basement level. There was one bathroom with a single toilet and single shower. The basement had three very small windows. In the summer, these windows were blocked by air conditioning units.

93.     There was not enough storage space in the home for all 18 workers, so workers, including Plaintiff Meza, placed their belongings under their beds.

94.     Defendants did not provide any toilet paper, paper towels, soap, or cleaning supplies for the bathrooms at either housing unit. As a result, Plaintiffs purchased these supplies and cleaned the kitchen and bathrooms themselves.

95.     Defendants prohibited Plaintiffs and other H-2A workers from buying or drinking alcohol throughout their employment. Defendants told several Plaintiffs that if they were caught drinking alcohol, they would be fired.

96.     Supervisors Reyes and Serrato prohibited Plaintiffs and other H-2A workers from leaving their respective housing units without their explicit permission. One day a week, Defendants provided Plaintiffs and other H-2A workers with transportation on a company-owned bus from their housing unit to a laundromat and grocery store in the nearby town of Meriden, CT. On these outings, the workers were accompanied by Defendants' supervisors.

97.     Outside of this weekly trip, Defendants regularly denied Plaintiffs and those similarly situated permission to leave the housing unit even for activities such as attending church. Defendants also generally prohibited H-2A employees from inviting guests to the housing facility.

98.     As a result of Defendants' restrictions, Plaintiffs and those similarly situated were geographically, socially, and linguistically isolated from the surrounding community. They were almost entirely cut off from other workers, other immigrants, service providers, and advocates.

99.     Because Plaintiffs and those similarly situated feared repercussions if they disobeyed their supervisors, including having their H-2A status revoked, being deported, and losing their only source of income, they generally did not leave their respective housing facilities—even in those instances where they lived apart from Manzana supervisors.

100.    These conditions facilitated Defendants' taking advantage of and extorting Plaintiffs and other similarly situated workers. For example, at the start of each season, Defendants regularly brought Plaintiffs and other workers to a store in Connecticut to purchase cell phones. However in 2024 Supervisor Reyes demanded that several Plaintiffs purchase cell phones through him.

101.    Supervisor Reyes told these H-2A employees that he would order the cell phones from a salesman in Michigan and the phones would subsequently be shipped to Connecticut. The price Supervisor Reyes quoted these employees was several hundred dollars more than what they regularly paid in Connecticut.

102.    When Plaintiff Perez Castro asked Supervisor Reyes for the phone number of the cellphone salesman in Michigan, in order to negotiate the price of the phone, Supervisor Reyes became angry with Plaintiff Perez Castro and told him to purchase the cell phone at the offered price without asking further questions. Supervisor Reyes said he would not bring these employees to the store in Connecticut and purchasing the cell phone through the Michigan salesman was the only option.

103.    Plaintiffs and those similarly situated would have no other way to communicate with family back in Mexico so they purchased the cell phone from Supervisor Reyes. Upon information and belief, Supervisor Reyes received compensation from the cell phone salesman for this arrangement.

104.    Because Defendants did not allow Plaintiffs and other similarly situated workers to leave Defendants' properties without their express permission—and because Defendants generally denied permission—Plaintiffs and other employees were not able to find work elsewhere in the United States and had no choice but to return to work for Defendants each year.

105.    Upon information and belief, Defendants limited H-2A workers' mobility, including Plaintiffs' mobility, in order to prevent them from reporting their living and working conditions and learning about other job options. Plaintiffs and those similarly situated continued laboring for Defendants because they feared that if they left, they would be unable to find any other employment, which would render them unable to support themselves and unable to send money to their families.

**Defendants Coerced Plaintiffs to Pay for Forced "Vacations"**

106.    For each calendar year, Plaintiffs and those similarly situated agreed to an employment period of approximately ten months starting in February or March and ending in December. These start and end dates varied slightly each year and are reflected in employees' H-2A contracts.

107.    However, each summer starting in 2020 during the low-growth period on the farm, Defendants forced Plaintiffs and those similarly situated to take an unpaid one-month "vacation," and return to Mexico. These forced vacations generally took place during the months of July and August. These forced vacations are not reflected anywhere in the H-2A contracts.

108.    Defendants informed Plaintiffs and other workers that if they stayed in Connecticut during the forced vacation period, there would be no work for them, and thus they would be without income.

109.    Plaintiffs did not request this "vacation" time. In fact, when Plaintiff Perez Castro affirmatively requested *not* to go back to Mexico and to instead continue working in Connecticut, Supervisor Reyes summarily denied his request without explanation. Moreover, Supervisor Reyes threatened Plaintiff Zavala that if he did not return to Mexico for the forced vacation period, he would not be recruited to return to work for Defendants the following season.

110.    By refusing to provide Plaintiffs and other H-2A workers with paid work during the forced vacation period, and threatening that they would not be recruited in subsequent seasons if they did not take the forced vacation, Defendants compelled Plaintiffs and those similarly situated to travel to Mexico because they could not otherwise afford to live in the United States for a month without income.

111.    Supervisors Reyes and Serrato, who operated the buses that provided the H-2A workers with their only reliable means of transportation, also left Defendants' property during the forced vacations. As such, Plaintiffs and other workers would have had no access to transportation to procure basic living necessities if they stayed in Connecticut during the forced vacation period.

112.    Despite their economic necessity to continue working, Plaintiffs and those similarly situated were compelled to agree to the forced vacation period to avoid losing their jobs and the opportunity for future H-2A employment, or being stranded in the U.S. with extremely limited mobility and without the economic means to provide for themselves.

113.    During the 2024 season, while the DOL's investigation of Defendants was pending, Defendant Manzana compelled their H-2A employees, including Plaintiffs, to sign a vacation "request" form. This "request" form included standardized language stating that the workers affirmatively requested a vacation to visit their families in Mexico and "recharge," that they understood they would have to cover the transportation costs, that there was still work for them on the farm, and that no Manzana employee had forced them to request the vacation.

114.    Defendants coerced Plaintiffs and those similarly situated into signing the "request" forms.

115.    Defendants made explicit and implicit threats that if Plaintiffs and other similarly situated workers did not leave for the forced vacation or sign the "voluntary" vacation request form, they would not be recruited for the following year's growing season.

116.    For each forced vacation, Defendant Manzana required Plaintiffs and other H-2A workers to pay for their travel to and from Mexico in full. Defendant purchased the transportation tickets on behalf of each worker and demanded reimbursement.

117.    In 2020, 2021, and 2022, Plaintiffs and other H-2A workers regularly returned to Mexico for the forced vacation by bus. To cover the bus tickets, Defendants required each H-2A worker to pay Manzana supervisors hundreds of dollars in cash in advance of the forced vacation.

118.    In 2023 and 2024, most Plaintiffs and other H-2A workers were forced to return to Mexico by plane. Manzana supervisors demanded hundreds of dollars from each H-2A worker for the flight costs upon their return from the forced vacation.

119.    Defendants routinely failed to provide Plaintiffs and those similarly situated with receipts for the travel expenses associated with the forced vacations.

120.    Defendant Manzana did not allow Plaintiffs and those similarly situated to purchase their own travel to and from Mexico for the forced vacations. Several Plaintiffs noticed that the transportation costs cited by Manzana supervisors were more expensive than the prices available online. When Plaintiffs Zavala and Perez Castro asked Supervisor Reyes whether they could purchase their own transportation tickets, Supervisor Reyes summarily denied the request, citing Defendants' "policy" that Defendants had to purchase the tickets for the workers.

121.    As a result of Defendants' withholding the "cheque de fondo" throughout the season, Plaintiffs and other H-2A workers were not paid for the workweek preceding the forced

vacation until after they returned from the forced vacation. Plaintiffs and similarly situated workers felt compelled to return to Connecticut, in part, to collect compensation for work they had already completed. If Plaintiffs and other similarly situated workers did not return to labor for the period following the end of the forced vacation, they risked the serious harm of losing pay and not being able to support themselves and their families.

122.    Upon information and belief, Defendants delayed payments in part to ensure that Plaintiffs and those similarly situated returned after the forced vacation.

123.    When Plaintiffs and other H-2A employees returned from the forced vacation period, Defendants continued their practice of delayed payment. Just as they did at the beginning of the growing season, Plaintiffs and other employees worked for two weeks and then received a paycheck for only one week's wages. Defendants retained the "cheque de fondo." Plaintiffs and other H-2A employees were not paid in full until the very end of the growing season.

124.    By forcing Plaintiffs and those similarly situated to take a vacation and lose a month's worth of income; demanding workers pay hundreds of dollars in travel costs; and refusing to pay workers on time for work performed until they returned from the forced vacation, Defendants compelled Plaintiffs and other similarly situated workers to return to the farms after the forced vacation to mitigate their extreme financial losses.

***Defendants Coerced Plaintiffs to Pay Unlawful Recruitment Kickbacks***

125.    At the end of each season, Defendants demanded Plaintiffs and similarly situated workers make kickback payments for hundreds of dollars as a condition for being recruited to work as H-2A employees the following year. Defendants required that these kickbacks be made in late November or early December, before the H-2A employees returned to Mexico. Defendants referred to these payments as "agradecimientos," which translates roughly to "gratitudes."

25

126.    Plaintiffs and similarly situated workers felt they had no choice but to pay the kickbacks to secure access to employment and income for the following season. In part because Plaintiffs and other workers were forced to pay unlawful costs and fees to Defendants— including for the forced vacation period and costs incurred during inbound and outbound travel—Plaintiffs and those similarly situated were still economically vulnerable at the end of each season. Plaintiffs and those similarly situated face a dire economic reality in Mexico. With no other employment prospects in Mexico and no authorization to work for another U.S. employer, Plaintiffs and other H-2A employees relied on their employment with Defendants to provide basic living necessities for themselves and their families, including medical care.

127.    Several Plaintiffs did not know of any other recruiters in their hometowns hiring for jobs in the United States or elsewhere.

128.    In demanding the kickbacks, Defendants provided and obtained the labor of Plaintiffs and those similarly situated for the following season. Plaintiffs and similarly situated workers were compelled to labor for Defendants the following year to avoid incurring the serious harm of having paid prospectively the costs of next year's recruitment without earning any income against this expense.

129.    Defendants assigned working hours and job assignments preferentially to those workers who paid larger kickbacks.

130.    In one instance, when additional work became available over one weekend, Plaintiff Perez Castro observed that those who were allowed to work the additional hours had all paid the prior season's kickback, whereas those who were not allowed to work the additional hours had not paid a kickback. Since Plaintiff Perez Castro had paid the kickback, he was allowed to work the additional weekend hours.

131.    Plaintiff Maximo never paid a kickback throughout his time working for Defendant Manzana. As a consequence, he was not brought back to work during the 2023 season and was only able to return in 2024 because friends of his negotiated with Supervisor Serrato. Plaintiff Maximo also observed that his hours worked per week were significantly less than other workers, which frustrated his ability to send money back home to his family.

132.    Upon information and belief, Defendant Williams was aware that Supervisors Reyes and Serrato charged these unlawful kickback, but Defendant Williams failed to take remedial action.

***Defendants Forced Plaintiffs to Pay for Outbound Travel***

133.    At the end of the employment period, occurring in either late November or early December of each season, Defendants forced Plaintiffs and other H-2A employees to pay for their own outbound travel costs from Connecticut to Mexico. Defendants only provided Plaintiffs with a nominal check for outbound transportation expenses.

134.    In 2019, 2020, 2021, 2022, and 2023 Defendants forced each Plaintiff and other H-2A employees to pay Defendants hundreds of dollars for bus or plane fare from Connecticut to Monterrey. Once in Monterrey, Plaintiffs and other H-2A employees took buses from Monterrey to their hometowns, for which they each paid in full. In every year that they worked for Defendants, Plaintiffs and other H-2A employees paid for their daily subsistence during travel from Connecticut to their hometowns.

135.    In each year relevant to this Complaint, Defendants failed to fully reimburse Plaintiffs and those similarly situated for their outbound transportation expenses including travel and daily subsistence costs.

136.    Defendants exploited the economic vulnerability of Plaintiffs and similarly situated workers by forcing them to pay outbound transportation costs.

***Defendants Purposely Obstructed DOL's Workplace Investigation***

137.    As early as October 2023, DOL initiated an investigation of Defendants for violations of H-2A program requirements. This investigation has included visits by DOL investigators to Defendant Casertano Greenhouses' farm.

138.    When DOL investigators visited the workers in or around October 2023 at Defendant Casertano Greenhouses' farm, Supervisors Reyes and Serrato instructed Plaintiffs and other H-2A workers not to say anything prejudicial about the supervisors or Manzana.

139.    Supervisors Reyes and Serrato specifically instructed some Plaintiffs to lie to investigators about payments made to supervisors, the forced vacations, operating a forklift, and handling products grown at other farms.

140.    Although none of the Plaintiffs were chosen for interviews with the DOL, Plaintiffs understood that they would be terminated or otherwise retaliated against if they shared honest information about their working conditions with the DOL investigators.

***Plaintiff Francisco Javier Zavala Martinez***

141.    Plaintiff Francisco Javier Zavala Martinez worked for Defendants from April 2021 to August 2024.

142.    Prior to his recruitment by Defendant Manzana, Mr. Zavala lived in the town of Palo Alto del Llano in Aguascalientes, Mexico.

143.    Mr. Zavala's mother suffers from kidney failure and in or around early 2021, the roof of her home collapsed. Mr. Zavala was looking for a job in the United States to support his ailing mother, his wife, and his three children, when he was recruited by Supervisor Reyes.

144.    Defendants failed to fully reimburse Mr. Zavala for all expenses incurred in traveling to the worksite, including transportation, daily subsistence, COVID-19 tests, and visa-related fees in 2021, 2022, 2023, and 2024.

145.    To cover these unreimbursed costs, and because Defendants would not issue his first paycheck for several weeks, Mr. Zavala was forced to take out high-interest loans worth hundreds of dollars before traveling to Connecticut in 2021, 2022, and 2023.

146.    Supervisor Reyes was aware that Mr. Zavala incurred these debts, as he occasionally referenced the loans in conversation with Mr. Zavala.

147.    Each season in the weeks before Mother's Day and from late September to December, Mr. Zavala worked overtime performing non-agricultural work. Mr. Zavala worked approximately 60 hours per week during these busy periods. Defendants did not pay Mr. Zavala overtime wages for this work.

148.    During his employment with Defendants, Mr. Zavala primarily resided at 344 E. Johnson Ave.

149.    When Mr. Zavala first saw the condition of the housing facility, he was surprised and upset at how dirty and crowded it was. Mr. Zavala felt he had no freedom because he was under constant surveillance by Supervisor Reyes.

150.    On at least one occasion, Mr. Zavala asked Supervisor Reyes if he could leave the housing facility to attend mass at a nearby church. Supervisor Reyes told Mr. Zavala he did not have permission to leave the housing facility outside of the weekly trip to town.

151.    When Mr. Zavala complained to Supervisor Reyes about the conditions in the housing facility, Supervisor Reyes replied in Spanish with words to the effect of, "why don't you

pay for a hotel or rent a house, then?" "If you don't like it, then just don't come back," and "this is the North, this is all we have, you just have to suck it up."

152.    In or around June 2024, Supervisor Reyes informed Mr. Zavala that his cousin's wife was running for city council in Aguascalientes. Supervisor Reyes used vulgar slang, "quiero que te pongas verga," to tell Mr. Zavala that he essentially needed to "man up." Supervisor Reyes said he knew that Mr. Zavala's family was voting for a different candidate, and he said to Mr. Zavala in Spanish "get aligned, or we'll align you." Mr. Zavala understood Supervisor Reyes to be threatening that if he and his family did not vote for Supervisor Reyes's family member, then Mr. Zavala would not be brought back the next season.

153.    In 2021, 2022, and 2023, Defendants forced Mr. Zavala to return to Mexico for about the month of August. In 2024, Defendants forced him to return to Mexico for about the month of July.

154.    At the demand of Defendants, Mr. Zavala paid for roundtrip bus travel for the forced vacation in 2021 and for roundtrip plane travel for the forced vacation in 2022 and 2023.

155.    In August 2021, because Mr. Zavala was forced to bear the unexpected costs associated with the forced vacations, including one month of unpaid wages, he had no choice but to take out a second high-interest loan of hundreds of dollars upon returning to Mexico during the forced vacation. Each year after that, Mr. Zavala prepared financially for the forced vacation, to ensure he did not have to take out a second loan mid-season.

156.    In 2024, Mr. Zavala did not pay for transportation costs associated with the forced vacation because he terminated his employment with Defendants shortly after returning to Connecticut following the forced vacation. When Mr. Zavala left, Defendants had not yet asked him and other workers for payment for the forced vacation costs.

157.    Mr. Zavala had no say in where he lived or worked, nor in the type of work he performed. For example, after the forced vacation in or around July 2021, Mr. Zavala was told there was not enough work for him at Defendant Casertano Greenhouses and he was taken to work at a plant nursery in Pennsylvania for several weeks. He was also occasionally transferred to different housing units for short periods at Defendants' discretion.

158.    At the end of each season, Supervisor Reyes demanded that Mr. Zavala pay him a kickback of hundreds of dollars. Mr. Zavala was told by other workers that if he did not pay Supervisor Reyes the kickback, he would not be hired for future seasons. Mr. Zavala observed that multiple workers who refused to pay the kickback were not brought back the next year. Mr. Zavala was forced to pay the end-of-season kickback in 2021, 2022, and 2023.

159.    Defendants failed to fully reimburse Mr. Zavala for all expenses incurred during outbound travel, including transportation and daily subsistence, in 2021, 2022, and 2023.

160.    Mr. Zavala did not leave his employment with Defendants during the season or between seasons because of Defendants' actions which exacerbated his extreme economic necessity. Mr. Zavala is the primary provider for his immediate family and mother in Mexico. He also believed that if he left Defendants' employment before the end of his contract, Defendants would report him to immigration.

161.    As a result of the extreme economic and psychological pressures Mr. Zavala felt during his employment with Defendants, Mr. Zavala experienced suicidal thoughts. These thoughts intensified during and were exacerbated by the forced vacations because of the loss of income. Mr. Zavala felt an overwhelming pressure to both support his immediate family and pay for his mother's medical needs. Mr. Zavala saw no way out of his situation, which caused him extreme stress, anxiety, and depression.

162.     Mr. Zavala was finally able to leave Defendants in August 2024 because he was granted deferred action in support of labor enforcement and a work permit.

163.     After Mr. Zavala left his employment with Defendants, Supervisor Reyes's cousin, referred to as "La Borrega," reached out to him to ask him to return. Upon information and belief, Supervisor Reyes's family wanted Mr. Zavala to return to ensure he would not speak out against Defendants' ongoing labor violations.

164.     Defendants owe Mr. Zavala his final check for work performed before leaving his employment in August 2024. After his departure Mr. Zavala texted Defendant Williams to request that this check be mailed to him. Defendant Williams responded asking Mr. Zavala what his name was. However, after Mr. Zavala provided his full name, Defendant Williams never responded again. Mr. Zavala then called Defendant Williams multiple times to follow up and he did not answer.

### Plaintiff Rene Meza Quirino

165.     Plaintiff Rene Meza Quirino worked for Defendants from April 2020 to September 2024.

166.     Prior to his recruitment by Defendant Manzana, Mr. Meza lived in the town of Localidad Almanza, Atzalan in Veracruz, Mexico.

167.     In or around February 2020, Supervisor Serrato recruited Mr. Meza to work for Defendants.

168.     Defendants failed to fully reimburse Mr. Meza for all expenses incurred in traveling to the worksite, including transportation, daily subsistence, COVID-19 tests, and visa-related fees in 2020, 2021, 2022, 2023, and 2024.

169.    In 2020, Mr. Meza incurred additional unreimbursed inbound transportation costs because he and other workers were forced to return from Nuevo Laredo to their hometowns twice, because of delays in issuing the H-2A visas caused by COVID-19. Defendant Manzana refused to pay for Mr. Meza's housing in Nuevo Laredo while he waited for the visa. Thus, Mr. Meza was forced to pay for travel to and from his home in Veracruz, a distance of nearly 700 miles, several times based on Defendants' mistaken instructions.

170.    To cover these unreimbursed costs, and because Defendants would not issue his first paycheck for several weeks, Mr. Meza was forced to take out high-interest loans worth hundreds of dollars before traveling to Connecticut in 2020 and 2021.

171.    Each season in the weeks before Mother's Day and from late September to December, Mr. Meza worked overtime performing non-agricultural work. Mr. Meza worked approximately 48 to 54 hours per week during these busy periods. Defendants did not pay Mr. Meza overtime wages for this work.

172.    In 2020, Mr. Meza resided at the group housing facility located at 344 E. Johnson Ave. In 2021, 2022, and 2023, Mr. Meza resided in the group housing facility located at 1086 S. Meriden Rd. In 2024, Mr. Meza was transferred to a different house provided by Defendants, located at 68 Sexton St., New Britain, CT 06051.

173.    When Mr. Meza asked Supervisor Serrato if he could go outside to play sports with his coworkers, or go to a store to purchase something, Supervisor Serrato became angry. Mr. Meza felt he had to satisfy Supervisor Serrato's every whim and that his quality of life depended on Supervisor Serrato's mood.

174.    Supervisor Serrato did not live in the 68 Sexton St. housing unit with Mr. Meza. Still, Mr. Meza only left the home in secret and for brief periods, because he feared his coworkers and housemates would report him to Supervisor Serrato.

175.    In 2020, 2021, 2022, and 2023, Defendants forced Mr. Meza to return to Mexico for about the month of July. In 2024, Defendants forced him to return to Mexico for about the month of August.

176.    At the demand of Defendants, Mr. Meza paid for roundtrip bus travel for the forced vacation in 2020, 2021, 2022, and 2023.

177.    In 2024, Defendants purchased Mr. Meza a round-trip flight to Mexico for the forced vacation. Mr. Meza understood that he was required to pay Supervisor Serrato for this flight upon his return to Connecticut. However, during his return flight on September 3, 2024, Mr. Meza had a layover in Charlotte Douglas International Airport, and he was stopped by Customs and Border Protection (CBP).

178.    A CBP Official told Mr. Meza that because he had been out of the country for more than 30 days, his H-2A visa was no longer valid. Mr. Meza informed the CBP official that because he did not book his own flights for the forced vacation, he had no control over the duration of the trip. The CBP official told Mr. Meza that he would have to pay $695 for a new visa, but his employer would reimburse him. Mr. Meza was never informed by Supervisor Serrato or any other representative of Defendants that leaving the country for more than 30 days would require him to obtain a new H-2A Visa. Mr. Meza paid $695 for the new visa with the understanding that he would be reimbursed.

179.    After returning to Connecticut, Mr. Meza requested reimbursement from Supervisor Serrato. Supervisor Serrato told Mr. Meza he would speak with Defendant Manzana's

main offices regarding the reimbursements, but never followed up. Soon after, Mr. Meza left his employment with Defendant Manzana without being reimbursed.

180.    After leaving his employment with Defendants, Mr. Meza called Defendant Williams on the phone and asked him to reimburse him for the visa costs. Defendant Williams insisted that the incident had been Mr. Meza's fault, because most of the other workers had gotten through CBP screening without any issues. Defendants have not reimbursed Mr. Meza the $695 USD to date.

181.    In the same phone call, Defendant Williams acknowledged that Defendants still had Mr. Meza's last paycheck for work performed prior to his departure. Defendant Williams stated he would keep the check as reimbursement of the $730 USD Mr. Meza purportedly owed Defendants for flight costs for the forced vacation.

182.    Mr. Meza had no say in where he lived or worked, nor in the type of work he performed. Mr. Meza was transferred between housing facilities three times throughout his employment. Although he primarily worked on Defendant Casertano Greenhouses' farm, he was also occasionally transferred to another farm for short periods at Defendants' discretion.

183.    At the end of each season, Supervisor Serrato demanded that Mr. Meza pay him a kickback of hundreds of dollars. Supervisor Serrato threatened Mr. Meza and other workers that if they did not pay these kickbacks, they would not be allowed to return for future seasons. Mr. Meza observed that workers who did not pay the kickback sometimes did not return the next season. Mr. Meza paid the kickback because he and his family could not afford to risk his employment.

184.    Defendants failed to fully reimburse Mr. Meza for all expenses incurred during outbound travel, including transportation and daily subsistence, in 2020, 2021, 2022, and 2023.

185.    Mr. Meza did not leave his employment with Defendants during the season or between seasons because of Defendants' actions which exacerbated his extreme economic necessity. Mr. Meza returned to work with Defendants each year because he felt he had no other option. He needed to provide for himself and his family in Mexico, and he did not know anyone in Mexico or in the United States who could help him get a different job.

186.    Mr. Meza was finally able to leave his employment with Defendants in September 2024 because he was granted deferred action in support of labor enforcement and a work permit.

***Plaintiff Carlos Giovanni Perez Castro***

187.    Plaintiff Carlos Giovanni Perez Castro worked for Defendants from March 2022 until August 2024.

188.    Prior to his recruitment by Defendants, Mr. Perez Castro lived in the town of Libertad in Aguascalientes Mexico.

189.    Mr. Perez Castro sought employment in the United States out of economic necessity to support his mother, wife, and two children, when he was recruited by Supervisor Reyes.

190.    Defendants failed to fully reimburse Mr. Perez Castro for all expenses incurred in traveling to the worksite, including transportation, daily subsistence, COVID-19 tests, and visa-related fees in 2022, 2023, and 2024.

191.    The first year that Mr. Perez Castro worked for Defendants, in 2022, he was forced to return back to his home in Aguascalientes from Nuevo Laredo because of a visa processing issue. When Supervisor Reyes, Mr. Perez Castro, and other workers arrived in Nuevo Laredo the visas were not ready. Supervisor Reyes instructed Mr. Perez Castro and the other workers to go back home to wait for their visas.

192.    Mr. Perez Castro paid for additional transportation to return to Aguascalientes by bus from Nuevo Laredo. Mr. Perez Castro unexpectedly spent two weeks in Aguascalientes waiting for the visa without pay.

193.    During this two-week period, Mr. Perez Castro was forced to take out a high-interest loan worth hundreds of dollars in order to cover the unexpected travel costs and the two-week period of unexpected unemployment.

194.    After two weeks, Supervisor Reyes instructed Mr. Perez Castro that the visas were ready. At the direction of Supervisor Reyes, Mr. Perez Castro once again paid for bus transport from Aguascalientes to Monterrey. Defendants organized and paid for a bus to transport Mr. Perez Castro and other workers from Monterrey to Connecticut.

195.    During his first year in 2022, Supervisor Serrato frequently demanded Mr. Perez Castro work harder than the other workers who were not new. On several occasions in 2022, Supervisor Serrato demanded Mr. Perez Castro "move faster" and "work harder."

196.    Each season in the weeks before Mother's Day and from late September to December, Mr. Perez Castro worked overtime performing non-agricultural work. Mr. Perez worked approximately 60 hours per week during these busy periods. Defendants did not pay Mr. Perez Castro overtime wages for this work.

197.    During his employment with Defendants, Mr. Perez Castro primarily resided at 344 E. Johnson Ave.

198.    Mr. Perez Castro had no say in where he lived or worked, nor the type of work performed. For example, on two separate occasions, Defendants moved Mr. Perez Castro for approximately one month to the smaller housing unit located at 1086 S. Meriden Rd.

199.    When housed at 344 E. Johnson Ave., Mr. Perez Castro erected pieces of cardboard around his bed in order to create some privacy.

200.    On several occasions in 2022, 2023 and 2024, Mr. Perez Castro requested to visit different stores during the weekly trip to town. Supervisor Reyes prohibited Mr. Perez Castro from visiting these other stores.

201.    On one occasion in 2023, Mr. Perez Castro was permitted to leave the residence to visit New York City for two days. When Mr. Perez Castro requested to take another trip to New York in 2024, Supervisor Reyes denied the request. Supervisor Reyes did not provide Mr. Perez Castro a reason why the request was denied.

202.    In 2022 and 2023, Defendants forced Mr. Perez Castro to return to Mexico for about the month of August. In 2024, Defendants forced him to return to Mexico for about the month of July.

203.    At the demand of Defendants, Mr. Perez Castro paid for roundtrip bus travel for the forced vacation in 2022 and for roundtrip plane travel for the forced vacation in 2023.

204.    In 2024, Mr. Perez Castro did not pay for transportation costs associated with the forced vacation because he terminated his employment with Defendants before returning to the worksite after the forced vacation.

205.    At the end of each season, Supervisor Reyes demanded that Mr. Perez Castro pay him a kickback of hundreds of dollars. Mr. Perez Castro observed that workers who did not pay the kickback were not hired for future seasons. Mr. Perez Castro was forced to pay the end-of-season kickback in 2022 and 2023.

206.    Mr. Perez Castro observed that those who did not pay enough money for the end-of-season kickback were assigned more physically intensive labor the following season. In

addition, workers who did not pay enough money for the end-of-season kickback were not offered the opportunity to work additional hours as additional work hours became available.

207.    Mr. Perez Castro observed that Supervisor Reyes offered preferential treatment to his family members and other workers who unquestionably complied with Defendants' orders and financial demands. For example, Mr. Perez Castro believed that, because he raised concerns about transportation costs and the forced vacations, he was instructed to pay a higher kickback amount than others and was assigned to less desirable, more physically demanding, work.

208.    Defendants failed to fully reimburse Mr. Perez Castro for all expenses incurred during outbound travel, including transportation and daily subsistence in 2022 and 2023.

209.    Mr. Perez Castro did not leave his employment with Defendants during the season or between seasons before August 2024 because of Defendants' actions which exacerbated his extreme economic necessity. Mr. Perez Castro is the sole provider for his immediate family in Mexico. He felt forced to comply with Defendants' demands out of fear that Defendants would not hire him back.

210.    Mr. Perez Castro did not know any other recruiters in Aguascalientes hiring for jobs in the United States.

211.    Defendants owe Mr. Perez Castro his final check for work performed before leaving his employment in August 2024.

***Plaintiff Luis Adrian Perez Garcia***

212.    Mr. Luis Adrian Perez Garcia worked for Defendants from March 2022 until November 2024.

213.    Prior to his recruitment by Defendants, Mr. Perez Garcia lived in the town of Palo Alto del Llano in Aguascalientes, Mexico.

214.    Defendants failed to fully reimburse Mr. Perez Garcia for all expenses incurred in traveling to the worksite, including transportation, daily subsistence, COVID-19 tests, and visa-related fees in 2022, 2023, and 2024.

215.    To cover these unreimbursed costs, and because Defendants would not issue his first paycheck for several weeks, Mr. Perez Garcia was forced to take out high-interest loans worth hundreds of dollars before traveling to Connecticut in 2022 and 2023.

216.    Each season in the weeks before Mother's Day and from late September to December, Mr. Perez Garcia worked overtime performing non-agricultural work. Mr. Perez Garcia worked approximately 60 hours per week during these busy periods. Defendants did not pay Mr. Perez Garcia overtime wages for this work.

217.    During his employment with Defendants, Mr. Perez Garcia primarily resided at 344 E. Johnson Ave. In 2024, he also resided at 38 Wilson St., New Britan, CT 06051.

218.    Mr. Perez Garcia felt he had no freedom because he was under constant surveillance by Supervisor Reyes.

219.    In 2022 and 2023, Defendants forced Mr. Perez Garcia to return to Mexico for about the month of August. In 2024, Defendants forced him to return to Mexico for about the month of July.

220.    At the demand of Defendant Manzana, Mr. Perez Garcia paid for roundtrip bus travel for the forced vacation in 2022 and for roundtrip plane travel for the forced vacation in 2023 and 2024.

221.    Mr. Perez Garcia had no say in where he lived or worked, nor the type of work he performed.

222.    Defendants failed to fully reimburse Mr. Perez Garcia for all expenses incurred during outbound travel, including transportation and daily subsistence, in 2022 and 2023. In 2024, Defendants failed to fully reimburse Mr. Perez Garcia for outbound transportation costs.

223.    In September 2024, Mr. Perez Garcia suffered a work-related knee injury. Defendants refused to provide Mr. Perez Garcia with adequate medical care. Mr. Perez Garcia was forced to consult a doctor in Mexico, who advised that he would need at least one month to rest. Supervisor Reyes instead told Mr. Perez Garcia not to leave the farm so as not to "be on bad terms" with Defendants. Defendants offered no support to Mr. Perez Garcia regarding his injury. Mr. Perez Garcia instead paid for his own transportation, including rideshare and air fare, in order to return to Mexico. Upon returning to Mexico, Mr. Perez Garcia took out an additional loan in order to finance his medical treatment.

224.    While Mr. Perez Garcia was in Mexico, Defendants called and harassed him to return to work, sometimes as many times as twice per day. In order to continue earning wages on his H-2A visa, support his wife's fertility treatments, and pay off his new and significant medical debt, Mr. Perez Garcia was compelled to return to Connecticut to continue working, despite resting for a shorter period of time than his doctor recommended.

225.    At the end of each season, Supervisor Reyes demanded that Mr. Perez Garcia pay him a kickback of hundreds of dollars. Mr. Perez Garcia was told by other works that if he did not pay Supervisor Reyes the kickback, he would not be hired for future seasons. Mr. Perez Garcia observed that multiple workers who refused to pay the kickback were not brought back the next year. Mr. Perez Garcia was forced to pay the end-of-season kickback in 2022, 2023, and 2024.

226.    Mr. Perez Garcia did not leave his employment with Defendants during the season or between seasons because of Defendants' actions which exacerbated his extreme economic necessity. Mr. Perez Garcia believed that if he left Defendants' employment before the end of his contract, Defendants would report him to immigration authorities. Mr. Perez Garcia was finally able to leave Defendants at the end of the season in November 2024 because he applied for deferred action in support of labor enforcement and a work permit.

**Plaintiff Victor Hugo Maximo Diaz**

227.    Plaintiff Victor Hugo Maximo Diaz worked for Defendants from approximately May 2019 until September 2024, excluding the 2023 season when he was not asked to return because he had not paid an end-of-year kickback.

228.    Prior to his recruitment by Defendants, Mr. Maximo lived in Mexico City, Mexico.

229.    During the 2019 season, Mr. Maximo first traveled from Mexico City to Michigan, where he worked for a few months, and later to Connecticut.

230.    Mr. Maximo's experience of and costs for traveling from Mexico City to Connecticut were roughly the same in the years in 2020, 2021, and 2022. In 2024, Mr. Maximo had moved from Mexico City to Localidad Almanza, Atzalan in Veracruz, Mexico, so he traveled with other workers from Veracruz to Connecticut.

231.    Defendants failed to fully reimburse Mr. Maximo for all expenses incurred in traveling to the worksite, including transportation, daily subsistence, COVID-19 tests, and visa-related fees in 2019, 2020, 2021, 2022, and 2024.

232.    To cover these unreimbursed costs, and because Defendants would not issue his first paycheck for several weeks, Mr. Maximo was forced to take out a high-interest loan worth

hundreds of dollars before traveling to Connecticut in 2019. After he was not recruited for the 2023 growing season, Mr. Maximo was forced to take out another loan before traveling to Connecticut in 2024.

233.    In 2019, Mr. Maximo worked for two months in Michigan picking apples. In October 2019, Defendant Lawrence told H-2A workers picking apples in Michigan that they would work 80 hours per week if they travelled to Connecticut to work there. Mr. Maximo understood that the more hours he was able to work, the more money he would be able to send back home to his family.

234.    Mr. Maximo worked primarily at Defendant Casertano Greenhouses in Connecticut for the 2020, 2021, and 2022 growing seasons. He also worked part of the 2024 growing season.

235.    Each season in the weeks before Mother's Day and from late September to December, Mr. Maximo worked overtime performing non-agricultural work. Mr. Maximo worked approximately 50 to 60 hours per week during these busy periods.

236.    Defendants instructed Mr. Maximo to engage in dangerous, non-agricultural work including changing roofs. Even while Mr. Maximo recognized that the work was dangerous, he followed Defendants' orders because he feared that if he did not, he would have his H-2A status terminated and lose access to his only source of employment.

237.    During his employment with Defendants Mr. Maximo primarily resided at 344 E Johnson Ave.

238.    On one occasion, Mr. Maximo went to play soccer outside with a group of other workers without asking Supervisor Serrato for permission. Supervisor Serrato got mad, and insinuated that a different supervisor would need to bring them back to work next year.

239.    In 2020, 2021, 2022, and 2024, Defendants forced Mr. Maximo to return to Mexico for about one month during the summer. At the demand of Defendants, Mr. Maximo paid for roundtrip bus travel for forced vacations in 2020, 2021 and 2022. In 2024, he paid for roundtrip plane travel for the forced vacation.

240.    Mr. Maximo had no say in where he lived or worked, nor the type of work he performed.

241.    Upon information and belief, Mr. Maximo was not asked to return for the 2023 growing season because he had not paid a kickback in prior years. Mr. Maximo received fewer hours of work compared to other workers who did pay kickbacks.

242.    Defendants failed to fully reimburse Mr. Maximo for all expenses incurred during outbound travel, including transportation and daily subsistence, in 2019, 2020, 2021, and 2022.

243.    Mr. Maximo was not given an option to choose the method of transportation and Supervisors Serrato and Reyes told him he could not purchase his own tickets home.

244.    Mr. Maximo did not leave his employment with Defendants during the season or between seasons because of Defendants' actions which exacerbated his extreme economic necessity. Mr. Maximo provides for his immediate family in Mexico. Mr. Maximo believed that if he left Defendants' employment before the end of his contract, Defendants would report him to immigration authorities.

245.    Mr. Maximo was finally able to leave Defendants in September 2024 because he was granted deferred action in support of labor enforcement and a work permit.

246.    Defendants owe Mr. Maximo his final check for work performed before leaving his employment in September 2024.

## CLASS ACTION CLAIMS

247.    Defendants' conduct described above was part of a scheme that Defendants applied to all Mexican nationals they recruited and employed in Connecticut. Plaintiffs therefore bring the claims alleged under 18 U.S.C §§ 1589, 1590, and 1594 as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3).

248.    **Class Definition**: Plaintiffs bring their claims under Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and a Class of similarly situated individuals defined as follows: "All H-2A employees recruited by Defendants in Mexico and employed by the Defendants primarily in Connecticut at any time since March 1, 2019." Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' predecessors and successors, and any entity in which Defendants have a controlling interest, as well as their officers, directors, and agents; (3) Plaintiffs' counsel and Defendants' counsel; and (4) the legal representatives, successors, and assigns of any such excluded persons. Plaintiffs reserve the right to revise the definition of the Class based upon subsequently discovered information.

249.    **Numerosity**: Class members are so numerous that joinder of all of them is impracticable. Upon information and belief, the Class includes at least 100 persons.

250.    **Commonality and Predominance**: There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. Common questions include, among others, whether:

- Defendants used serious harm or threats of serious harm, engaged in the abuse or threatened abuse of law or legal process, and/or engaged in a scheme, plan, or pattern intended to compel H-2A employees to continue working for them by:

    i.   Failing to reimburse H-2A employees for all inbound and outbound travel expenses;

    ii.   Demanding H-2A employees pay for travel associated with an involuntary one-month unpaid vacation each season;

    iii.   Demanding unlawful recruitment kickbacks to secure employment for the following growing season;

    iv.   Failing to pay H-2A employees for overtime worked associated with non-agricultural products; and

    v.   Threatening H-2A employees with termination of employment and loss of H-2A status.

- Defendants, by and through their agents, knowingly recruited, transported, provided, or obtained H-2A workers for labor by various coercive means;

- Defendants engaged in a conspiracy to knowingly recruit, transport, provide or obtain H-2A workers for labor by various coercive means; and

- Plaintiffs and members of the proposed Class are entitled to damages or other relief based on Defendants' unlawful conduct.

251.   **Typicality**: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs were all recruited by Defendants in Mexico through the H-2A program, worked primarily for Defendants in Connecticut, and sustained injuries and damages arising out of and proximately caused by Defendants' use of serious harm or threats of serious harm; abuse or threatened abuse of law or legal process; and/or scheme, plan, or patten intended to compel members of the Class to continue working for Defendants.

252.    **Adequacy of Representation**: Plaintiffs are adequate representatives because their interests do not conflict with the interest of the Class that they seek to represent. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation, and Plaintiffs and Plaintiffs' counsel intend to litigate this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

253.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class brought under 18 U.S.C §§ 1589, 1590, and 1594. It would be highly burdensome and extremely inefficient for individual members of the Class to individually litigate the wrongs done to them. Even if the members of the Class could afford such individual litigation, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based, on *inter alia*, Defendants' records.

## FIRST CLAIM FOR RELIEF

### FORCED LABOR – 18 U.S.C. § 1589

### AGAINST ALL DEFENDANTS

254.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference. These allegations are also made on behalf of the proposed Class.

255.    Plaintiffs bring this claim against all Defendants.

256.    Plaintiffs and members of the proposed Class bring this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595, against Defendants for violations of 18 U.S.C. § 1589.

257.    In violation of 18 U.S.C. §1589(a)(2), Defendants forced Plaintiffs and members of the proposed Class to pay the costs associated with their recruitment and forced vacations, caused Plaintiffs and members of the proposed Class to incur significant debts, prevented them from finding other means of employment, and made threats of deportation in order to cause Plaintiffs and members of the proposed Class to labor. Defendants frustrated and delayed the ability of Plaintiffs and members of the proposed Class to send money home to their families with the same intent.

258.    In violation of 18 U.S.C. § 1589(a)(3), Defendants abused the H-2A program, forced Plaintiffs and members of the proposed Class to pay the costs of their recruitment, made threats of deportation, demanded unlawful kickbacks, and systematically delayed the pay of Plaintiffs and members of the proposed class in order to cause them to labor.

259.    In violation of 18 U.S.C. §1589 (a)(4), Defendants undertook a scheme, plan, or pattern which, in the totality of circumstances, was intended to cause Plaintiffs and members of the proposed Class to believe they would suffer serious harm if they did not labor for Defendants. Components of this scheme, plan, or pattern include: engaging in the unlawful conduct described in Paragraphs 257 and 258 above, severely restricting Plaintiffs' and proposed Class members' movements, isolating Plaintiffs and members of the proposed Class, preventing Plaintiffs and members of the proposed Class from learning about other immigration opportunities in the United States, forbidding Plaintiffs and members of the proposed Class from speaking with investigators from the DOL, failing to advise Plaintiffs and members of the

proposed Class of their rights under the H-2A program, underpaying Plaintiffs and members of the proposed Class, assessing unlawful charges as a company policy, and otherwise creating and exploiting an atmosphere of fear and domination.

260.    Defendants' unlawful conduct described in Paragraphs 257, 258, and 259 caused Plaintiffs and members of the proposed Class to labor for Defendants.

261.    Defendants knowingly benefitted financially and/or by receiving the value of Plaintiffs' and proposed Class members' labor through their participation in a venture which Defendants knew or should have known was engaging in violation of the TVPRA, or in reckless disregard of the fact that the venture was in violation of the TVPRA, in violation of 18 U.S.C. §§ 1589 and 1595.

262.    Accordingly, Plaintiffs and members of the proposed Class are entitled to compensatory damages, liquidated damages, emotional distress damages, punitive damages and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### TRAFFICKING – 18 U.S.C. § 1590

### AGAINST ALL DEFENDANTS

263.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference. These allegations are also made on behalf of the proposed Class.

264.    Plaintiffs bring this claim against all Defendants.

265.    Plaintiffs bring this civil claim pursuant to the civil remedy provisions of the TVPRA, 18 U.S.C. § 1595, against Defendants for violations of 18 U.S.C. § 1590.

266.    Defendants, by and through their agents, knowingly recruited, transported, provided, or obtained Plaintiffs and members of the proposed Class for labor by various coercive means in violation of 18 U.S.C. § 1590.

267.    Plaintiffs and members of the proposed Class have suffered injury and are accordingly entitled to recover damages, including punitive damages and attorneys' fees, pursuant to 18 U.S.C. § 1595(a).

### THIRD CLAIM FOR RELIEF

### CONSPIRACY – 18 U.S.C. § 1594

### AGAINST ALL DEFENDANTS

268.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference. These allegations are also made on behalf of the proposed Class.

269.    Plaintiffs bring this claim against all Defendants.

270.    Plaintiffs bring this civil claim pursuant to the civil remedy provisions of the TVPRA, 18 U.S.C. § 1595, against Defendants for violations of 18 U.S.C. § 1594.

271.    Defendants conspired with one another to violate 18 U.S.C. §§ 1589 and 1590.

272.    Defendants agreed to recruit, transport, provide, and obtain Plaintiffs and members of the proposed Class for labor or services in violation of 18 U.S.C. §§ 1589 and 1590.

273.    Each of the Defendants engaged in at least one overt act in furtherance of the conspiracy, including but not limited to:

- Defendants Manzana and Lawrence Williams recruited Plaintiffs and members of the proposed Class to work for Defendants and, after their arrival in the United States, warned them of the serious harm they would suffer if they attempted to stop working for Defendants or to seek employment elsewhere.

- Defendants failed to pay Plaintiffs and members of the proposed Class adequate wages and overtime wages; failed to fully reimburse Plaintiffs and members of the proposed Class for transportation expenses; and required Plaintiffs and members of the proposed Class to make unlawful payments in furtherance of their unlawful scheme.

- All Defendants benefitted financially and/or by receiving Plaintiffs' and proposed Class members' labor through their participation in a venture Defendants knew or should have known was in violation of the TVPRA.

274.    Each Defendant intentionally engaged in these acts and additional acts in furtherance of their agreed plan to deny Plaintiffs and members of the proposed Class the compensation they were entitled to under their H-2A contracts and federal law and to coerce Plaintiffs and members of the proposed Class to continue working for Defendants and not to seek work elsewhere.

275.    Plaintiffs and members of the proposed Class suffered damages as a direct and proximate result of Defendants' conspiracy.

276.    Accordingly, Plaintiffs and members of the proposed Class are entitled to compensatory damages, liquidated damages, emotional distress damages, punitive damages and attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### FEDERAL MINIMUM WAGE VIOLATIONS – 29 U.S.C. § 206(a)

### AGAINST ALL DEFENDANTS

277.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

278.    Plaintiffs bring this claim against all Defendants.

279.    Plaintiffs bring this claim for Defendants' violations of the minimum wage provisions of the FLSA, 29 U.S.C. §§ 201 *et seq.*

280.    Defendants violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiffs at least the product of the federal minimum wage of $7.25 and the total number of hours of labor performed in each workweek during which they were employed.

281.    Defendants willfully failed to fully reimburse Plaintiffs during their first week of employment of each season for expenses incurred primarily for the benefit of Defendants, including for the total cost of inbound travel from their hometowns in Mexico to the jobsite, their inbound subsistence costs, and visa-related fees. Defendants knew that they were required to pay Plaintiffs at least the federal minimum wage for each hour worked during a workweek. As such, Defendants' failure to pay Plaintiffs the minimum wage during their first week of employment was willful within the meaning of 29 U.S.C. § 255.

282.    Defendants willfully failed to fully reimburse Plaintiffs during their final week of employment of each season for expenses incurred primarily for the benefit of Defendants, including for the total cost of outbound travel from the jobsite to their hometowns in Mexico, their outbound subsistence costs, and unlawful kickbacks or recruitment fees. Defendants knew that they were required to pay Plaintiffs at least the federal minimum wage for each hour worked during a workweek. As such, Defendants' failure to pay Plaintiffs the minimum wage during their last week of employment was willful within the meaning of 29 U.S.C. § 255.

283.    Defendants willfully failed to pay Plaintiffs timely, within the meaning of 29 U.S.C. § 206(a).

284.    Accordingly, Plaintiffs are entitled to recover from Defendants, jointly and severally, their unpaid minimum wage compensation, an additional equal amount as liquidated damages, reasonable attorneys' fees, and costs of the action, pursuant to 29 U.S.C. § 216(b).

## FIFTH CLAIM FOR RELIEF

### FEDERAL OVERTIME VIOLATIONS – 29 U.S.C. § 207(a)

### AGAINST ALL DEFENDANTS

285.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

286.    Plaintiffs bring this claim against all Defendants.

287.    Defendants failed to pay Plaintiffs at the overtime rate required by 29 U.S.C. § 207(a) for each hour of work above forty hours in any workweek in which they worked more than forty hours and performed work where they were not engaged in agriculture.

288.    Upon information and belief, Defendants' failure to pay Plaintiffs overtime at a rate of one-and-a-half times the promised wages was willful within the meaning of 29 U.S.C. § 255.

289.    Accordingly, Plaintiffs are entitled to recover from Defendants, jointly and severally, their unpaid minimum wage compensation, an additional equal amount as liquidated damages, reasonable attorneys' fees, and costs of the action, pursuant to 29 U.S.C. § 216(b).

## SIXTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

### AGAINST ALL DEFENDANTS

290.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

291.   Plaintiffs bring this claim against all Defendants.

292.   For each year that a Plaintiff worked for Defendants, an enforceable contract existed between that Plaintiff on the one hand and all Defendants on the other.

293.   Those contracts incorporate the H-2A regulations and comprise the terms and conditions of employment contained in each H-2A contract. 20 CFR § 655.122(q).

294.   Defendant Manzana executed all H-2A contracts relevant to this action.

295.   All other Defendants are jointly and severally liable on each contract because all other Defendants are joint employers of Plaintiffs.

296.   In addition and in the alternative, Defendants Casertano Greenhouses, John Casertano, and Lawrence Williams are liable as third-party beneficiaries of Defendant Manzana's express contract with Plaintiffs.

297.   While employed by Defendants, Plaintiffs fulfilled their contractual obligations.

298.   Defendants breached their employment contracts with Plaintiffs by creating terms and conditions of employment that contradicted the H-2A contracts and violated H-2A regulations incorporated in the H-2A contracts

299.   Defendants breached these employment contracts each season Plaintiffs were employed by:

- Failing to fully reimburse Plaintiffs for their inbound transportation and subsistence costs associated with travel from Mexico to the worksite at the beginning of the season, 20 CFR § 655.122(h)(1);

- Failing to fully reimburse Plaintiffs for fees associated with obtaining their H-2A visas, 20 CFR §§ 655.135(j)–(k);

- Failing to fully reimburse Plaintiffs for their outbound transportation and subsistence costs associated with travel from the worksite to Mexico at the end of the season, 20 CFR § 655.122(h)(2);

- Failing to reimburse Plaintiffs for travel and subsistence costs associated with the one-month involuntary vacations Defendants forced Plaintiffs to take in the middle of the growing season each year, 20 CFR §§ 655.122(h)(1)–(2); 20 C.F.R. § 655.122(p);

- Failing to pay Plaintiffs weekly as indicated on the job order of each season, 20 C.F.R. §655.122(m);

- Charging Plaintiffs an unlawful recruitment fee, or "kickback," at the end of each season to secure employment for the following year, 20 C.F.R. §§ 655.135(j)–(k);

- Failing to pay Plaintiffs overtime compensation during workweeks in which Plaintiffs handled the products of other growers and were not employed in agriculture as required under 29 U.S.C. § 207(a), 20 C.F.R. § 655.135(e), and 29 C.F.R. § 780.209; and

- Failing to provide housing that complied with applicable local, state and federal housing safety standards, 20 C.F.R. § 655.122(d).

300.    Defendants' breaches caused substantial injury in that each Plaintiff lacks thousands of dollars that are rightfully his.

301.    Defendants' intentional breach of contract was malicious and outrageous conduct.

302.    Accordingly, Plaintiffs are entitled to relief including compensatory and punitive damages.

## SEVENTH CLAIM FOR RELIEF

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

## AGAINST ALL DEFENDANTS

303.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

304.    Plaintiffs bring this claim against all Defendants.

305.    Plaintiffs and Defendants were parties to the H-2A contract under which Plaintiffs reasonably expected to receive the benefits guaranteed by the H-2A program regulations.

306.    Defendants' actions have impeded Plaintiffs right to receive benefits that they reasonably expected to receive under their H-2A contracts.

307.    Defendants acted in bad faith when injuring Plaintiffs' rights to receive benefits they reasonably expected to receive under their contracts.

308.    Upon information and belief, Defendants were at all times aware of their obligations as H-2A program employers and violated the terms of the H-2A contracts in order to obtain a cheap, exploitable source of labor from Mexico.

309.    Defendants are repeat players in the H-2A program, and Defendant Manzana has been the subject of prior litigation regarding its breach of H-2A contracts.

310.    Defendants received multiple visits from the DOL which put Defendants on further notice of their obligations under the H-2A program.

311.    Defendants threatened Plaintiffs to ensure that they did not speak to the DOL investigators about Defendants' H-2A contract violations.

312.     Upon information and belief, Defendants have a general business practice of acting intentionally to create terms and conditions of employment which contradict the H-2A contract and violate the H-2A regulations incorporated therein.

313.     Defendants have acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of their duties by intentionally failing to reimburse Plaintiffs for inbound and outbound transportation and subsistence costs, fees associated with obtaining H-2A visas and COVID tests, and costs associated with the forced vacations.

314.     Defendants have acted in bad faith and violated the implied covenant of good faith and fair dealing in the performance of their duties by charging Plaintiffs an unlawful kickback at the end of each season, failing to pay Plaintiffs overtime compensation during workweeks in which they were not employed in agriculture, and failing to provide adequate housing.

315.     Defendants have acted in bad faith and violated the implied covenant of good faith and fair dealing by forcing Plaintiffs to take a one-month unpaid vacation every year.

316.     As a direct cause of Defendants' bad faith, Plaintiffs have suffered loss and damages, as already set forth herein. Accordingly, Plaintiffs are entitled to relief including compensatory and punitive damages.

## EIGHTH CLAIM FOR RELIEF

### CONVERSION

### AGAINST ALL DEFENDANTS

317.     Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

318.     Plaintiffs bring this claim against all Defendants.

319.    At common law in Connecticut, a court may award a plaintiff damages for conversion if the plaintiff can prove that: the material at issue belonged to the plaintiff; the defendant deprived the plaintiff of that material for an indefinite period of time; the defendant's conduct was unauthorized; and the defendant's conduct harmed the plaintiff.

320.    By forcing Plaintiffs to pay kickbacks, Defendants undertook conduct unauthorized by the H-2A program or any other law and deprived Plaintiffs of thousands of dollars for an indefinite period of time.

321.    By forcing Plaintiffs to pay kickbacks, Defendants maintained exclusive control of funds earned by Plaintiffs through their labor.

322.    Accordingly, Plaintiffs are entitled to relief including compensatory damages in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF

### STATUTORY THEFT – Conn. Gen. Stat. § 52-564

### AGAINST ALL DEFENDANTS

323.    Plaintiffs incorporate each of the allegations contained in the preceding paragraphs by reference.

324.    Plaintiff brings this claim against all Defendants.

325.    In requiring Plaintiffs to pay kickbacks, Defendants acted intentionally and violated Conn. Gen. Stat. § 52-564.

326.    Accordingly, Plaintiffs are entitled to relief including treble damages.

## JURY DEMAND

327.    Plaintiffs request a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a. With respect to the claims alleged under 18 U.S.C. §§ 1589, 1590, and 1594, certify a Class of all H-2A employees recruited by Defendants in Mexico and employed by the Defendants primarily in Connecticut at any time since March 1, 2019, and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

b. Declare that Defendants, by the acts and omissions described above, violated Plaintiffs' and proposed Class members' rights under the TVPRA at 18 U.S.C. §§ 1589, 1590, and 1594, as set forth in Plaintiffs' First, Second, and Third Claims for Relief;

c. Grant judgment in favor of Plaintiffs and proposed Class members, for each of their TVPRA claims, and award Plaintiffs and members of the Class the amount of their damages pursuant to 18 U.S.C. § 1595(a), including compensatory and punitive damages in an amount to be determined at trial together with attorneys' fees;

d. Award Plaintiffs monetary damages for unpaid wages and overtime, plus liquidated damages in an equal amount, as provided by 29 U.S.C. §§ 201 *et seq.* in an amount to be determined at trial;

e. Award Plaintiffs monetary relief in the form of compensatory and punitive damages as provided under the common law of the State of Connecticut for breach of contract;

f.  Award Plaintiffs monetary relief in the form of compensatory and punitive damages as provided under the common law of the State of Connecticut for breach of the implied covenant of good faith and fair dealing;

g.  Award Plaintiffs treble their damages for statutory theft as provided by the State of Connecticut, in an amount to be determined at trial;

h.  In the alternative, award Plaintiffs, at a minimum, compensatory damages for conversion, as provided by the State of Connecticut, in an amount to be determined at trial; and

i.  Grant such additional and further relief as the Court deems just and proper.


Dated: December 2, 2024

/s/ Muneer I. Ahmad

Muneer I. Ahmad, Supervising Attorney (ct432642)
Madelyn Finucane, Supervising Attorney*
Laura Plata, Law Student Intern**
Natalia Poblete, Law Student Intern**
Gabriela Torres-Lorenzotti, Law Student Intern**
Theodore Watler, Law Student Intern**

* Motion for admission *pro hac vice* forthcoming.
**Motion for law student appearance forthcoming.