## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FRANCISCO JAVIER ZAVALA MARTINEZ, et al., | : | CIVIL ACTION NO. 3:24-cv-01900-VAB |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| MANZANA, LLC, et al. | : | |
| | : | |
| Defendants | : | FEBRUARY 18, 2025 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Plaintiffs make a number of sensational allegations designed to capture attention but not based on legally sufficient facts. Much of Plaintiffs' complaint rests on concerns with the income disparity between residents of the United States compared with residents of their home country of Mexico. These are important public policy questions to be raised with the government agencies that regulate the H-2A temporary agricultural visa program or with Congress, but do not support a claim for "human trafficking" against Defendants in this case. Plaintiffs' complaint is with the economic conditions in Mexico and the structure of the legal visa program that allows foreign nationals to work in U.S. agriculture, but their Complaint does not assert actionable claims against their employer, Manzana, LLC, let alone against Manzana's president, Lawrence Williams, Manzana's client (N. Casertano Greenhouses & Farms, Inc.), nor John Casertano, individually. The Complaint raises questions of fact that will need to be resolved later, such as the FLSA and H-2A contract claims in Counts 4-9, but those claims should be separated from the policy arguments improperly included here as "forced labor," "human trafficking" or "conspiracy" claims in Counts 1-3.

The H-2A visa program is the only legal means of employing foreign national workers in agriculture. It is a highly-regulated government program, requiring a series of approvals by state and federal agencies before visas are issues and foreign nationals are allowed to enter the United States to work. The Secretary of Labor may not certify an employer to apply for visas unless he or she is convinced that: (a) "there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition"; and (b) "the employment of the [foreign national][1] in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." 8 U.S.C. § 1188(a)(1)(A) and (B).

An H-2A visa-holder is only authorized to work for their designated sponsoring employer, as a matter of law. Plaintiffs raise valid policy arguments as to what this means for the employment relationship between the U.S. employer and the foreign national employee, but that is something to address to Congress or the federal agencies responsible for the H-2A program, not something that this Court can redress against these Defendants. The Complaint decries the "rampant abuse" in the "Bracero" program, mentioning only in passing that the program ended **in 1964**, decades before the H-2A program was created in 1986, even longer before Manzana, LLC was created, and likely before Plaintiffs were even born. Complaint at ¶ 20. Clearly, the references to how the Bracero program was considered by one commentator to be "legalized slavery" or caused "abuse" to workers are intended to garner attention, rather than having any possible legal significance in this case.

Likewise, the Complaint refers broadly to the "dire conditions" in Mexico without context or explanation of how Defendants are responsible for such conditions? Complaint at ¶ 21.

---

[1] The 1986 statute uses the term "alien," which is now considered anachronistic and disfavored.

Plaintiffs repeat the argument that "H-2A agricultural workers do not receive the full protection of the United States federal employment and labor law," id. at ¶ 22, but do not identify which protections are provided to U.S. agricultural workers but denied to H-2A workers. There are no such protections; under 20 C.F.R. § 655.135(e), all H-2A employers are explicitly required to "comply with all applicable Federal, State, and local laws and regulations, including health and safety laws." Section 655.135(e) specifically references the Fair Labor Standards Act ("FLSA") which applies to H-2A employers in exactly the same way that it applies to non-H-2A agricultural employers. The characterization of the FLSA as "a relic of this nation's racist past," is grossly misleading. Complaint at ¶ 22. The legislative history of the FLSA in the 1930s raises serious concerns about racial motivations of exempting African American farmworkers in the South from minimum wage and overtime protections, not from any animus against foreign-born farmworkers under visa programs that would not exist for years after the law's passage. Moreover, the Complaint acknowledges that overtime protections do exist for some agricultural work, based on subsequent amendments to the FLSA. Id. But more importantly, those are problems to take to Congress, not to try to paint Defendants or other agricultural employers as somehow complicit in.

Slavery is an indelible stain on our nation's history. Comparing the violent legacy of human bondage with "forced vacations" cheapens the idea of "forced labor" and insults all those who endured that cruel and inhumane institution. Plaintiffs and their student advocates should be careful with how they deploy such powerful language and perhaps be more aware of the history that they reference but may not fully understand.

After the initial "shock-and-awe" of the Complaint's opening pages, it pivots quickly to a drier recitation of the numerous regulatory requirements that the federal government demands of H-2A employers like Manzana and thousands of others in the United States – free inbound and

outbound travel and meal payments, free employer-provided housing and local transportation, government-set wages higher than the federal or state minimum wage, and so forth.  Complaint at ¶¶ 25-30.  There may be factual disputes regarding the timing or amount of reimbursements paid and the details of overtime eligibility under the agricultural exemption in the Fair Labor Standards Act ("FLSA"), but Plaintiffs inappropriately attempt to bootstrap those routine employment law issues into "forced labor" and "trafficking" claims.  Even taking Plaintiffs' allegations at face value, most of those claims still fail to state an actionable claim against Defendants and should be dismissed under Rule 12(b)(6) of the Federal Rules of Procedure.

## I.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiffs are five Mexican citizens who were employed by Defendant Manzana, LLC for some part of the period from 2019 to 2024.[3]  Complaint at ¶¶ 3-7.  Plaintiffs worked for Manzana for 3 to 6 growing seasons each.  Id.  The H-2A job orders were filed by Manzana, LLC alone, rather than as a joint-employer under 20 C.F.R. § 655.131(b).  For each year during that time period, Manzana had a contract with N. Casertano Greenhouses & Farms, Inc. ("NCGFI"), but there was no direct contract between Plaintiffs and NCGFI (nor the individual Defendants, Lawrence Williams or John Casertano).

The H-2A work period was approximately 10 months long in each of those years, from February or early March until late November or early December.  Plaintiffs and their co-workers travelled from Connecticut to Mexico for up to a month at the mid-summer point of the work

---

[2] For purposes of this motion, Defendants take as true all well-plead allegations in Plaintiffs' Complaint but reserve the right to dispute and/or contest them at any other time and for any other purpose.

[3] Plaintiffs indicate that they "reside" in Texas, Pennsylvania, or Florida (Complaint at ¶¶ 3-7), but do not explain their current legal status.  That may be relevant in the future, as the H-2A rules have slightly different requirements for foreign national visa holders than for "U.S. workers" as defined in 20 C.F.R. § 655.103(b) (U.S. citizens but also certain foreign nationals).

period "during the low-growth period on the farm." Id. at ¶ 106. NCGFI is a farm and wholesale plant and tree nursery in Cheshire, Connecticut, and Plaintiffs worked with plants, flowers, and trees. Id. at ¶¶ 35, 37. Plaintiffs make a number of allegations against their co-workers or crew leaders regarding the visa application and travel process. Id. at ¶¶ 44-61. Defendants deny most of the factual statements in the Complaint, but for purposes of the current motion, will address only those allegations that, even the underlying facts are taken as true for consideration of the motion to dismiss, still fail to state a claim on which relief may be granted.

## II.  STANDARD OF REVIEW

"To survive a motion to dismiss under 12(b)(6), a complaint must contain a "'short and plain statement of the claim showing that the pleader is entitled to relief.'" See Henderson v. Quiros, No. 3:21-cv-1078 (VAB), 2023 WL 2457236, at *2 (D. Conn. Mar. 10, 2023) (citing Fed. R. Civ. P. 8(a)). "Any claim that fails 'to state a claim upon which relief can be granted' will be dismissed." Id. (citing Fed. R. Civ. P. 12(b)(6)). "In reviewing a complaint under Rule 12(b)(6), a court applies a 'plausibility standard' guided by 'two working principles.'" Id. (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"First, '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Henderson, at *2 (citing Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Second, 'only a complaint that states a plausible claim for relief survives a motion to dismiss.'" Id. (citing Iqbal, 556 U.S. at 679). "When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. Id. (citing Iqbal, 556 U.S. at 678). "The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor." Id. (citing Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 359 (2d Cir. 2013)). "A plaintiff's

'[f]actual allegations must be enough to raise a right to relief above the speculative level' and assert a cause of action with enough heft to show entitlement to relief and 'enough facts to state a claim to relief that is plausible on its face.' Id. at *3 (citing Twombly, 550 U.S. at 555, 570). "A claim is facially plausible if 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' Id. (citing Iqbal, 556 U.S. at 678). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Twombly, 550 U.S. at 557). Where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief," Twombly, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." Id. at 570.

## III. ARGUMENT

### A. The Only H-2A Employer Here is Manzana, LLC; the Individual Defendants and NCGFI Should be Dismissed

Plaintiffs allege that all four Defendants, Manzana, NCGFI, Lawrence Williams, and John Casertano, "are associated in fact, are engaged in a continuous business relationship, and comprise a venture as that term is used in 18 U.S.C. §§ 1589, 1590, 1594, and 1595." The term "venture" is not defined in any of those provisions[4], and Plaintiffs offer neither a definition nor factual statements that would support such an allegation. Like all farm labor contractors, Manzana has clients who are farms or nurseries to which it helps provide seasonal agricultural labor. For purposes of H-2A employment, only the employer submitting the application for temporary employment certification and receiving such a certification from the Department of Labor is the "employer" for H-2A purposes. Garcia-Celestino v. Consolidated Citrus Ltd. Partnership, 898

---

[4] The term "venture" is not even used in half of those sections.

F.3d 1110, 1118 (11th Cir. 2018) (specifically, that the certified H-2A "labor contractor" was the H-2A employer and not the grower-client with whom they contracted).[5]  Plaintiffs acknowledge that Manzana was the H-2A employer and contracted with NCGFI (and other farms and nurseries nearby in central Connecticut) but then quickly seek to erase those distinctions and refer collectively to how "Defendants recruited Plaintiffs and similarly situated workers," "Defendants threatened Plaintiffs," and so forth.  Complaint at ¶¶ 47, 310.  No claim is made that Mr. Casertano, individually, nor NCGFI, played any role in the recruitment process, nor transportation reimbursements or payroll activities related to Plaintiffs nor any other H-2A workers, and certainly no allegation that they were involved in threatening Plaintiffs or any other workers.

**B.  Counts 1-3 Fail to State a Claim for Under the TVPA**

The Trafficking Victims Protection Act ("TVPA") prohibits "forced labor," defined in the statute as follows:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means –
>> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>> (2) by means of serious harm or threats of serious harm to that person or another person;
>> (3) by means of the abuse or threatened abuse of law or legal process; or
>> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
> shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a).  The Complaint fails to meet the pleading requirements under any of the possible forms of "forced labor" under the TVPA.

**1.  There Is No Valid Claim for "Serious Harm"**

The Complaint alleges that "In violation of 18 U.S.C. § 1589(a)(2), "Defendants forced

---

[5] Under the broader "suffer or permit to work" standard from the FLSA, those limited claims against the grower survived, but the H-2A contract claims were denied by the Eleventh Circuit.

Plaintiffs and members of the proposed Class to pay the costs associated with their recruitment and forced vacations."  Complaint at ¶ 257.  The Complaint does not assert that Defendants caused them "serious harm" or "threats of serious harm," as is required for a Section 1589(a)(2) claim. For purposes of Section 1589(a)(2), the term "serious harm" is defined to mean:

> … any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).  No physical, psychological, or reputational harm is alleged; only financial harm is asserted in the Complaint.

Where courts have found that "financial harm" is "sufficiently serious" to survive a Rule 12(b)(6) motion, it has required more than a decrease in earning power by returning to one's home country.  In <u>Baldia v. RN Express Staffing Registry</u>, *LLC*, 633 F. Supp. 3d 693 (S.D.N.Y. 2022), the court denied a motion to dismiss where the complaint alleged that a nurse from the Philippines had an employment contract with a $33,320 "liquidated damages" clause if she terminated her employment with her U.S. visa sponsor employer and was required to execute a promissory note in that amount in favor of the employer.  The payment of that considerable sum of money was "sufficiently serious" in <u>Baldia</u> to survive a motion to dismiss, as was a $25,000 "contract termination fee" in <u>Paguirigan v. Prompt Nursing Emp. Agency, LLC</u>, 286 F. Supp. 3d 430, 438 (E.D.N.Y. 2017).

No similar contract provision is present in the employment relationship between Manzana and Plaintiffs, and none is even alleged in the Complaint.[6]  Nor do Plaintiffs claim that the cost of

---

[6] The Department of Labor's Office of Foreign Labor Certification reviews the terms of each employment agreement and would never approve such a provision.  More to the point, Manzana has never and would never include such a provision in their employment contracts.

hotels or meals while travelling to the United States rose to anywhere near the $25,000 or $33,000 level involved in those other cases. The threat of being forced to pay tens of thousands of dollars, a significant share of those workers' annual earnings, is a legitimate form of "financial harm" under Section 1589(a)(2) and (c)(2) in a way that purchasing a bus ticket or meals simply is not.

"Section 1589 is 'intended to address **serious** trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.'" <u>Muchira v. Al-Rawaf</u>, 850 F.3d 605, 618 (4th Cir. 2017) (emphasis in original), quoting <u>United States v. Dann</u>, 652 F.3d 1160, 1170 (9th Cir. 2011). "The harm or threat of harm, 'considered from the vantage point of a reasonable person in the place of the victim, must be "sufficiently serious" to **compel** that person to **remain**' in her condition of servitude when she otherwise would have left." <u>Id</u>. (emphasis in original), quoting <u>Dann</u> at 1170. Section 1589 has an express *scienter* requirement; evidence must show "'that the employer **intended** to cause the victim to believe that she would suffer serious harm – from the vantage point of the victim – if she did not continue to work.'" <u>Id</u>. (emphasis in original). "The test of undue pressure is an objective one, asking how a reasonable employee would have behaved." <u>United States v. Bradley</u>, 390 F.3d 145, 153 (1st Cir. 2004), <u>vacated on other grounds</u>, 545 U.S. 1101 (2005).

"[N]ot all bad employer-employee relationships or even bad employer-immigrant ... relationships will constitute forced labor." <u>Dann</u>, 652 F.3d at 1170; <u>cf</u>. <u>United States v. Toviave</u>, 761 F.3d 623, 629 (6th Cir. 2014) (noting that "we should not—without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person *in loco parentis* to require household chores"). In each of the cases interpreting the scope of Section 1589

here, the foreign national workers asserted their claims shortly after arriving in the United States,

asserting that they had not expected the conditions here when they left their home abroad.  Each

of the Plaintiffs in this case worked in Connecticut for Manzana for at least 3 years, returning home

each winter and visiting their family during the contract period.  Plaintiffs do not allege that the

2024 season was substantively different than the 2023, 2022, 2021, 2020, or 2019 seasons.

Claiming some "bait-and-switch" or that they objectively felt "compelled to remain" in the United

States is belied by their own allegations in the Complaint and fails to pass the "plausibility test" to

survive a motion to dismiss.  Cf. Complaint at ¶ 51 ("Defendants provided little to no information

about costs they would incur in the course of their recruitment…").

As a matter of law, even if taken as true, Plaintiffs' allegations about travel expenses or

fees do not rise to the level of "sufficiently serious" "financial harm" necessary to establish a claim

for "forced labor" or "human trafficking."  Count One of the Complaint should be dismissed.

### 2.   There Is No Valid Claim for "Abuse of Law or Legal Process"

Plaintiffs' claim of a Section 1589(a)(3) violation must also be dismissed, as a matter of

law.  To meet the *actus reus* elements of an "abuse of law or legal process" claim, a plaintiff must

show "the use or threatened use of a law or legal process, whether administrative, civil, or criminal,

in any manner or for any purpose for which the law was not designed, in order to exert pressure

on another person to cause that person to take some action or refrain from taking some action."  18

U.S.C. § 1589(c)(1).  Plaintiffs offer the following arguments for how "Defendants" (collectively)

committed this offense: (1) Plaintiffs paying "the costs of their recruitment" or "unlawful

kickbacks"; (2) "threats of deportation"; and (3) "systematically delayed" pay.  Complaint at ¶ 258.

### a.   "Delayed Payments"

Turning first to the "delayed" payments as a form of "coercion," that argument is not

supported by the law. Under the H-2A regulations, there is no requirement that an employer pay workers in the same week in which wages are earned, only that the employer must pay wages "when due" and must pay the worker "at least twice monthly." 20 C.F.R. § 655.122(m). Under Connecticut GSA § 31-17b(a)(1) and (b), an employer "shall pay weekly, or once every two weeks, all wages … due each employee" and "The end of the pay period for which payment is made on a regular pay day shall be not more than eight days before such regular pay day, provided, if such regular pay day falls on a nonwork day, payment shall be made on the preceding work day."

This clearly contemplates the typical situation, particularly where the weekly earnings vary according to an irregular work schedule, where the "pay period" is a week removed from the "pay day." That is exactly the situation here – workers perform a certain amount of work in a pay period; Manzana reports that to NCGFI or any other grower client; the client pays Manzana early the next week, and Manzana pays the workers at the end of that week. So, each week's check relates back to work performed during the previous pay period, a week removed from that week's pay day, precisely as permitted by Connecticut law and the H-2A regulations. Each week's work is paid, but it would be logistically impossible to hand a check for the precise amount at the end of the last workday in that pay period. There is no "scheme" to coerce workers here; it is simply a matter of basic payroll practice.

### b. Kickbacks and Fees

Of those, the allegations about recruitment costs and kickbacks are not an abuse of the legal process, they are allegations of a failure to comply with existing legal prohibitions.[7] It defies belief

---

[7] Plaintiff Maximo admits that he "never paid a kickback throughout his time working for Defendant Manzana." Complaint at ¶ 131. This obviously undercuts Plaintiffs' claims that these "kickbacks" were required and raises serious concerns to be addressed later regarding class certification questions. Despite explicit prohibitions against workers collecting or making such illegal payments, they still occur in the H-2A program. Manzana recently terminated scores of workers for participating in such illegal schemes and is committed to a zero-tolerance policy for

that *every* violation of the H-2A regulations arises to the level of "slavery," particularly given the expansive and often byzantine web of regulations that govern the program. According to the Government Accountability Office, "From FY 2018 through FY 2023, 84 percent of DOL's investigations of employers found one or more violations, with the most common violations related to pay." GAO, H-2A Visa Program: Agencies Should Take Additional Steps to Improve Oversight and Enforcement, GAO-25-106389 (Nov. 2024). Surely if 84% of employers were engaged in "slavery," the government would show some urgency to address this crisis? In the current case, as Plaintiffs note in an unnumbered paragraph on page 2 of their Complaint, "Since at least October 2023, the Department of Labor has been investigating Defendants' unlawful practices." If the Department of Labor, a federal agency with broad enforcement authority and a multibillion dollar budget, has identified "unlawful practices" by Manzana at the level of "slavery," would we not expect them to have issued findings, assessed back wages and penalties, or otherwise taken steps to address such a situation? They have not, because these allegations involve claims of technical violations of the H-2A regulations and not "forced labor" or "slavery."

Plaintiffs never explain to whom, exactly, they paid the alleged "agradecimientos" near the end of the H-2A contract. Complaint at ¶ 125. There is no specific allegation that any of the four named Defendants collected such a "kickback" from the workers. And the only way that Plaintiffs claim they were "coerced" or "forced" to make these payments boils down to their desire to work outside Mexico: "Plaintiffs and those similarly situated face a dire economic reality in Mexico"; and "[s]everal Plaintiffs did not know of any other recruiters in their hometowns hiring for jobs in the United States of elsewhere." Complaint at ¶¶ 126-127. As discussed above, the macroeconomic

_____

such payments now and in the future. Plaintiffs do not assert that they reported any payments like this to anyone in Manzana (as their job order required them to do); claiming vaguely that "on information and belief," the company was "aware" of this happening.

conditions in a foreign country are not Defendants' fault. Plaintiffs desire to earn a better living for themselves and their families is noble – that is exactly what brought previous generations to the United States. Most of them, at least. But it is absolutely <u>not</u> the same conditions that brought those to the United States <u>involuntarily</u> in human bondage. Plaintiffs must not be permitted to erase that legacy by blurring lines; there is an immeasurable gulf between leaving one's home for brief periods of time to earn more money abroad than one might at home and leaving one's home by force or violence. A claim of "forced labor" because U.S. wages are higher than those in another country has no place here.

### c.     "Deportation" vs. Mandatory Reporting Requirements

As for the threat of "deportation," that is an official action by the government and not something that any of Defendants have the power or inclination to do. To the extent that Plaintiffs are stating that Defendants told them that they would have to leave the United States if they quit or were fired from their job with Manzana, that is not a threat but rather an accurate statement of the H-2A visa program's requirements, as designed by Congress and implemented by the Department of Labor and Department of Homeland Security.

As defined by the Department of Homeland Security "An H-2A classification applies to an alien who is coming temporarily to the United States to perform agricultural work of a temporary or seasonal nature." 8 C.F.R. § 214.2(h)(1)(ii)(C). The work for which H-2A workers are hired must have a definite end-date within a year and the H-2A visa holders may only stay in the United States on a valid visa with a specific end-date. Under the terms of the H-2A job order, DOL affirmatively requires H-2A employers to notify their workers of the duty to depart the United States when their employment ends:

**(i) Notify workers of duty to leave United States.**

(1) The employer must inform H-2A workers of the requirement that they leave the United States at the end of the period certified by the Department or separation from the employer, whichever is earlier, as required under paragraph (i)(2) of this section, unless the H-2A worker is being sponsored by another subsequent H-2A employer.

(2) As explained further in the DHS regulations, a temporary agricultural labor certification limits the validity period of an H-2A Petition. See 8 CFR 214.2(h)(5)(vii). A foreign worker may not remain beyond their authorized period of stay, as determined by DHS, nor beyond separation from employment prior to completion of the H-2A contract, absent an extension or change of such worker's status under the DHS regulations. *See* 8 CFR 214.2(h)(5)(viii)(B).

20 C.F.R. § 655.135(i).  An H-2A employer is also expressly required by regulation to report to the Department of Homeland Security's U.S. Citizenship and Immigration Services within 2 workdays when an H-2A worker's employment is terminated or the worker fails to report for work for 5 consecutive days without the permission of the employer.  8 C.F.R. § 214.2(h)(5)(vi)(B)(*1*). Upon that mandatory notification, USCIS terminates the validity of the H-2A visa.  This is a highly-regulated program by which the federal government manages and tracks the admission of foreign nationals; the reporting and "duty to leave" disclosures are not threats by employers nor are they an "abuse" of legal process but, rather, strictly mandated ***compliance*** with legal requirements imposed on them by federal agencies.

### 3. There Is No Valid Claim for a "Scheme or Plan" to Cause "Serious Harm"

Under Section 1589(a)(4), a "scheme, plan, or pattern" to cause "serious harm" (or "physical restraint" of the worker "or another person") can constitute "forced labor."  Plaintiffs' Complaint fails to state a valid claim for such a "scheme, plan, or pattern" by Defendants.  In paragraph 259 of the Complaint, Plaintiffs reiterate the claims discussed above under Sections 1589(a)(2) and (a)(3), adding further allegations about "restricting Plaintiffs' movements," "isolating" them, and "preventing them from learning about other immigration opportunities in the

United States" or "advising them of their rights under the H-2A program." Complaint at ¶ 259. As far as their rights under the H-2A program, all H-2A employers are required by law to provide a copy of the job order to any prospective H-2A worker before they apply for their visa at the consulate abroad. 20 C.F.R. § 655.122(q). Plaintiffs do not allege that Manzana (the only Defendant subject to the H-2A requirements) failed to provide this required disclosure; thus it is not clear how Defendants "failed to advise them" of their H-2A rights.

Regarding "other immigration opportunities in the United States," Plaintiffs do not explain what those might include (applying for an immigrant visa to move to the United States? employment with a different sponsoring employer?) and certainly do not explain why Defendants had any responsibility to advise them of such "opportunities" nor how they prevented them from learning of this public information available online or from any number of other sources.

The "restrictions on movement" and concern with supervisors leaving for the one-month vacation in Mexico reflect a misunderstanding of the H-2A requirements. The meal requirement, for example, states that employers must either "provide each worker with three meals a day or must furnish free and convenient cooking and kitchen facilities to the workers that will enable the workers to prepare their own meals." 20 C.F.R. § 655.122(g). While the H-2A rules require free transportation for workers between the employer-provided housing and the worksite "at no cost to the worker" (Section 655.122(h)(3)), there is no comparable requirement to transport workers to off-site locations outside of work hours. Many employers, including Manzana, offer such a service for free as a benefit to their H-2A workers (see, *infra*, link to 2024 job order, local transportation to shopping and banks discussed at p.3 of job order), but it is not required under the H-2A rules, any more than free local shuttle rides would be free to U.S. workers at any other job. That does not, in any way, mean that Plaintiffs were "restricted" in their ability to move about or to acquire

information about other jobs or anything else that interested them, any more than the U.S. District Court not offering free shuttle rides to law clerks would be engaged in "forced labor" as to them.

### 4. Plaintiffs' "Forced Vacation" Claims and the "Three-Fourths Guarantee"

Not surprisingly, no case law seems to exist for "forced labor" claims based on a "forced vacation" argument. Complaint at ¶¶ 106-124. Spending time with one's family at home and not working is, in fact, the exact opposite of "forced labor." To the extent that Plaintiffs' theory is that work was not available at a consistent weekly level during the entire 10-month contract period from February to December, or at least that they were not aware of this fact, then this claim is belied by their own allegations and by the H-2A regulations. First, Plaintiffs specifically allege that these one-month vacations began "each summer starting in 2020 during the low-growth period on the farm." Id. at ¶ 107. Plaintiffs acknowledge, however, that they chose to return each year after 2020 to work under the exact same schedule, and also note that this one-month period corresponds to the growing patterns of the plants, not the whim of their employer. Id.

Agricultural work differs from factory or office work; this is not a typical 9-to-5 job, each day varies according to the weather, amount of daylight, growing stage of the plants or crops being handled, and so forth. In recognition of this, the H-2A regulations do not require employers to offer H-2A workers 100% of the "anticipated hours" listed on the job order that is provided to DOL and to the workers at the time of recruitment. Rather, the H-2A rules require only that employers offer workers at least three-fourths of the total anticipated hours shown on the job order, measured not on a weekly basis but over the duration of the job order. 20 C.F.R. § 655.122(i). In the example provided by the Department of Labor:

> Therefore, if, for example, a work contract is for a 10-week period, during which a normal workweek is specified as 6 days a week, 8 hours per day, the worker would have to be guaranteed employment for at least 360 hours (10 weeks × 48 hours/week = 480 hours × 75 percent = 360). If a Federal holiday occurred during

the 10-week span, the 8 hours would be deducted from the total hours for the work contract, before the guarantee is calculated. Continuing with the above example, the worker would have to be guaranteed employment for 354 hours (10 weeks × 48 hours/week = (480 hours−8 hours (Federal holiday)) × 75 percent = 354 hours).

20 C.F.R. § 655.122(i)(1)(iii).  Plaintiffs do not allege that Manzana, LLC failed to offer them three-fourths of the total hours on the 10-month contract.[8]  So, a one-month break in a 10-month growing season is not a violation of the H-2A requirements, let alone "forced labor."

While the Court must accept Defendants allegations as true, for purposes of the present motion, even true allegations do not support a claim for relief here.  If such claims survive the current motion, Manzana will present evidence that Plaintiffs and their coworkers specifically requested this time to visit their families.[9]  Spending 4 or 5 months in another country, away from one's loved ones, is a long time.  While Plaintiffs were clearly interested in maximizing their earnings, it still makes perfect sense that they would wish to see their families.  The "vacation request" form discussed in paragraph 113-114 was simply to reflect, in writing, the request to travel home that workers had already made orally to Manzana.  The vague allegation that "Defendants made explicit and implicit threats" regarding the form in paragraph 115 is not nearly adequate to survive a 12(b)(6) motion.  The allegations regarding the travel arrangements involves a credibility determination, but suffice it to say that Manzana's evidence of those events directly contradicts Plaintiffs' allegations in the Complaint.

### 5.  Plaintiffs' "Trafficking" and "Conspiracy" Claims Must be Dismissed

Plaintiffs reiterate their "forced labor" claims in the form of "trafficking" (Section 1590) and "conspiracy" (Section 1594) but they all rest on the same problematic lack of actionable factual

---

[8] It would seem to undercut a claim of "forced labor" to also claim that one did not labor as much as one wanted.

[9] There is no proof in the Complaint that "Supervisor Reyes" was authorized to speak on behalf of Manzana (let alone the other three Defendants) as to any consequences of choosing not to travel home to Mexico nor the prospect of directly-purchased plane tickets.  Complaint at ¶¶ 109, 120.

allegations.  For the reasons set forth about on the "forced labor" TVPA claims, the trafficking and conspiracy claims must also be dismissed.  If anything, the conspiracy claims are even weaker, since they depend on underlying violations of the TVPA that did not occur <u>and</u> proof of an agreement between Defendants (or other parties not included in the Complaint) and at least one overt act by each of them in furtherance of the allege conspiracy.  The Complaint lacks sufficient allegations as to each of these required elements of such a claim.  Allegations of underpaid wages may be actionable under a breach-of-contract or FLSA claim (Manzana would disagree but will have that argument at a later date), but certainly do not rise to the level of a conspiracy to commit human trafficking.  Calling wage claims that strips the idea of all meaning.

## C.  <u>The Contract Claims Against any Defendant but Manzana Must be Dismissed</u>

The claims for breach of the "covenant of good faith and fair dealing" in Count 7 of the Complaint (¶¶ 303-316) must be dismissed against Defendants Lawrence Williams, John Casertano, and NCGFI.  It is "settled law" in Connecticut that such claims may not be asserted against entities who are not parties to the contract.  <u>Bruno v. Whipple</u>, 138 Conn. App. 496, 501-502, 54 A.3d 184, 189 (2012).  Plaintiff in <u>Bruno</u> conceded "as she must, that a person cannot be held liable for breach of the implied covenant of good faith and fair dealing without being a party to a contract."  <u>Id.</u> at 510.  The H-2A "contracts" here are official public records, published by the Department of Labor.  See, e.g., https://seasonaljobs.dol.gov/api/job-order/H-300-24024-663991 (2024 Manzana H-2A contract including work for NCGFI and CK Growers).[10]  The only employer

---

[10] Also worth noting in that 2024 job order are the following:  (1) recitation of the requirement to notify DOL and DHS if workers abandon the job; (2) requirement to advise workers of need to return home; (3) express prohibition against payment of recruitment fees <u>and</u> need to notify Manzana if any fees are paid or requested; (4) statement that "If a worker engages in work that qualifies for overtime under state or federal law, the employer will pay overtime" (page 14); (5) a discussion of inbound/outbound travel reimbursements (p.16); (6) variability of daily work schedule (p.17); and (7) coordination of travel arrangement (p.21).  The detail of the job order is necessitated by the exacting requirements of the H-2A regulations but also provides a highly

identified is clearly Manzana, LLC, not Mr. Williams, not Mr. Casertano, and not the individual

nurseries where Manzana, LLC's workers would work.

Plaintiffs misapply the "third-party beneficiary" rule here. The contractual promises that

they seek to enforce are by Manzana to them. That is all. They seek to make the individual

Defendants and NCGFI into "third-party *obligors*" to Plaintiffs, rather than third-party

*beneficiaries* on the H-2A job order. The law does not allow expansion of a contract in that

direction, only to parties who seek to assert a benefit under the agreement:

> The third party beneficiary doctrine provides that "[a] third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract.... Therefore, a third party beneficiary who is not a named obligee in a given contract may sue the obligor for breach." …

> Under the third party beneficiary doctrine, "[t]he ultimate test to be applied [in determining whether a person has a right of action as a third party beneficiary] is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary].... [T]hat intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties....

Wykeham Rise, LLC v. Federer, 305 Conn. 448, 473-474, 52 A.3d 702, 719 (2012). The H-2A

job order is, technically, an agreement between a prospective H-2A employer and the U.S.

Department of Labor. Courts have noted that the authorizing statute, the INA, does not expressly

create a of action by H-2A workers to enforce the provisions of the job order. Nieto-Santos v.

Fletcher Farms, 743 F.2d 638, 641 (9th Cir. 1984). But a state-law claim to enforce the contract

against the H-2A employer may exist. See, e.g., Centeno-Bernuy v. Becker Farms, 564 F. Supp.

2d 166, 183 (S.D.N.Y. 2008). Still, it is only the H-2A job order that provides the entitlement to

benefits that Plaintiffs seek to enforce, rather than the contract between NCGFI and Manzana. The

rate-of-pay, timing of pay, travel reimbursements, and all other provisions are in the H-2A job

---

specific view into the employment relationship, belying the theory that Plaintiffs had no idea what
to expect when they got to the United States.

order alone, and may only be enforced against Manzana, LLC.

Likewise, the state law "breach of contract" claims against non-parties to the H-2A job order must also be dismissed.  See Consolidated Citrus, supra.  To the extent that Plaintiffs have pleaded FLSA claims for minimum wage and overtime violations, given the procedural posture of this motion, it is possible that such claims may survive as to parties who are not H-2A employers.  But claims within the four corners of the H-2A job order may only be made against the H-2A employer certified by the Department of Labor, that being Manzana, LLC.  Thus, Counts 6 and 7 must be dismissed as to the individual Defendants and NCGFI.

### D.      Plaintiffs' Conversion and Statutory Theft Claims Must be Dismissed

As discussed above, some of the Plaintiffs (but not all) claim to have paid "kickbacks" to one or more crew leaders or coworkers.  They have not, however, pleaded that payments were made to any of the Defendants.  Accordingly, the claims in Counts 8 and 9 of the Complaint for common-law "conversion" or "statutory theft" under Conn. Gen. Stat. § 52-564 must be dismissed.  There is nothing linking the alleged payments to Defendants, let alone the necessary *scienter* by any of Defendants to meet the requirements for those claims.  The compensatory and treble damage claims in those Counts of the Complaint should be dismissed as to all Defendants.

## IV.      CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their partial motion to dismiss Plaintiffs' Complaint.  Defendants stand ready to defend themselves and their reputations from the scandalous misrepresentations splashed across the Complaint, but for the time being, will ask that the Court dismiss the claims discussed above, even in the light most favorable to Plaintiffs as required by Rule 12(b)(6) motions, for failing to state claims upon which relief might be granted.

Respectfully submitted,

DEFENDANTS
MANZANA, LLC; LAWRENCE WILLIAMS;
N. CASERTANO GREENHOUSES & FARMS,
INC.; JOHN CASERTANO

By their attorneys,


  _/s/ Kevin R. Brady_____
Kevin R. Brady (ct22135)
FISHER & PHILLIPS LLP
400 Connell Drive, Suite 4000
Berkeley Heights, NJ 07922
Tel: (212) 710-1909
Fax: (908) 516-1051
_kbrady@fisherphillips.com_
-and-
Christopher J. Schulte (*pro hac vice* pending)
FISHER & PHILLIPS LLP
1401 New York Avenue, N.W., Suite 400
Washington, DC  20005
Tel: (202) 559-2440
Fax: (202) 978-3788
_cschulte@fisherphillips.com_

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of February, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

 */s/ Kevin R. Brady*
Kevin R. Brady

FP 53873758.1