**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FRANCISCO JAVIER ZAVALA
MARTINEZ, RENE MEZA QUIRINO,
CARLOS GIOVANNI PEREZ CASTRO,
LUIS ADRIAN PEREZ GARCIA, and
VICTOR HUGO MAXIMO DIAZ,
    *Plaintiff*s,

      v.

MANZANA, LLC; N. CASERTANO
GREENHOUSES & FARMS, INC.;
LAWRENCE WILLIAMS; and JOHN
CASERTANOPENNYMAC LOAN
SERVICES,
    *Defendants.*

No.3:24-cv-01900-(VAB)

**RULING AND ORDER ON MOTION TO DISMISS**

Francisco Javier Zavala Martinez, Victor Hugo Maximo Diaz, Rene Meza Quirino,

Carlos Giovanni Perez Castro, and Luis Adrian Perez Garcia ("Plaintiffs") have filed this action

against John Casertano, Manzana, LLC, N. Casertano Greenhouses & Farms, Inc., and Lawrence

Williams ("Defendants"), asserting claims arising out of the Plaintiffs' work in the United States

under the H-2A program, including claims under the Trafficking Victims Protection Act, 18

U.S.C. § 1589, and Connecticut tort law. Am. Compl., ECF No. 30 ("Am. Compl.").

The Defendants have moved to dismiss the Amended Complaint. Renewed Motion to

Dismiss, ECF No. 36; Mem. in Supp., ECF No. 18; Pls.' Opp'n, ECF No. 41; Defs.' Reply, ECF

No. 45.

For the reasons explained below, the Defendants' renewed motion to dismiss is

**GRANTED** in part and **DENIED** in part.

1

The renewed motion to dismiss is **GRANTED** only to the limited extent that the Plaintiffs' claim under 18 U.S.C. § 1589(a)(3) is construed to exclude any theory premised solely on the Defendants' providing notice required by 20 C.F.R. § 655.135(i).

The renewed motion to dismiss is otherwise **DENIED**, including as to the Plaintiffs' forced labor claim under 18 U.S.C. § 1589, the Plaintiffs' abuse-of-law-or-legal-process theory under 18 U.S.C. § 1589(a)(3) as construed, the Connecticut breach of the implied covenant of good faith and fair dealing claim, and the Plaintiffs' Connecticut-law conversion and statutory theft claims

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

The Plaintiffs are H-2A agricultural workers who allege that they were recruited to perform agricultural labor in Connecticut and worked under conditions that they contend amount to forced labor and related misconduct under federal law and Connecticut law. Am. Compl., ECF No. 30.

The supervisors associated with the worksite allegedly exercised control over aspects of the Plaintiffs' employment and, among other responsibilities, collected payments from H-2A employees. Am. Compl. ¶¶ 51–52. The Defendants also allegedly demanded "kickback" payments as a condition of recruitment and refer to those payments as "agradecimientos." Am. Compl. ¶ 133.

The Defendants allegedly created an "atmosphere of fear" through threats tied to visa-dependent status and that those threats carried an implied risk of immigration consequences. Am. Compl. ¶ 88. The Plaintiffs allege restrictions on movement and contend they generally did not

leave employer-provided housing due to fear of repercussions, including immigration-related consequences. Am. Compl. ¶¶ 104, 107.The Plaintiffs also allege that supervisors instructed certain Plaintiffs to provide false information to investigators about payments and related practices. Am. Compl. ¶ 149.

### B. Procedural History

On December 2, 2024, Francisco Javier Zavala Martinez, Victor Hugo Maximo Diaz, Rene Meza Quirino, Carlos Giovanni Perez Castro, and Luis Adrian Perez Garcia filed the initial Complaint against John Casertano, Manzana, LLC, N. Casertano Greenhouses & Farms, Inc., and Lawrence Williams. Compl., ECF No. 1.

On December 6, 2024, the Clerk of Court issued summonses. Summonses, ECF No. 10.

On January 16, 2025, waivers of service were returned and executed as to John Casertano, Manzana, LLC, N. Casertano Greenhouses & Farms, Inc., and Lawrence Williams. Waivers, ECF No. 11.

On February 18, 2025, the Defendants filed a partial motion to dismiss the Complaint and a memorandum in support. Partial Mot. to Dismiss, ECF No. 17; Mem. in Supp., ECF No. 18.

On March 11, 2025, the Plaintiffs filed the Amended Complaint. Am. Compl., ECF No. 30.

On March 25, 2025, the Defendants filed a motion to dismiss the Amended Complaint. Mot. to Dismiss Am. Compl., ECF No. 36.

On April 7, 2025, based on the parties' joint status report, the Court relieved the parties of the obligations in its prior order and permitted the parties to file a revised Rule 26(f) report. Order, ECF No. 38; Joint Status Report, ECF No. 37.

On April 8, 2025, the Court denied as moot the partial motion to dismiss the initial Complaint. Order, ECF No. 39.

On April 25, 2025, the Plaintiffs filed their memorandum in opposition to the motion to dismiss the Amended Complaint. Pls.' Opp'n, ECF No. 41.

On April 28, 2025, the Court entered a scheduling order. Scheduling Order, ECF No. 42.

On May 16, 2025, the Defendants filed their reply in further support of the motion to dismiss the First Amended Complaint. Defs.' Reply, ECF No. 45.

## II.     STANDARD OF REVIEW

To survive a motion to dismiss under 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court

4

takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *See also York v. Ass'n of the Bar of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

III.    **DISCUSSION**

**A. The 18 U.S.C. § 1589 Forced Labor Claim**

The Trafficking Victims Protection Act of 2000 ("TVPA"), 18 U.S.C. § 1589, prohibits "knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means." *United States v. Pollok*, 139 F.4th 126, 138 (2d Cir. 2025) (quoting that § 1589 "prohibits 'knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means' ").[1]

Those means include "(1) means of force, threats of force, physical restraint, or threats of physical restraint;" "(2) means of serious harm or threats of serious harm;" "(3) means of the abuse or threatened abuse of law or legal process;" or "(4) means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." *Id.* (quoting 18 U.S.C. § 1589(a)). Because the statute is written in the disjunctive, "the government was not required to prove a 'showing of force' " where the evidence (or allegations) otherwise fit within the statute's enumerated means. *Id.* at 138 (stating "the government was not required to prove a 'showing of force' " because "the plain text of the statute expressly provides that 'any one of' the

---

[1] Although when initially passed by Congress, this statute only created criminal liability, "[i]n 2003, Congress amended the TVPA to include a private right of action, which was amended in 2008." *Anora v. Oasis Professional Management Group, Ltd.*, No. 19-cv-11732 (LJL), 2023 WL 2307180 at \*6, S.D. N.Y., March 1, 2023)(citations omitted).

enumerated types of conduct ... standing alone would violate Section 1589" and noting "the listed types of conduct are structured in the disjunctive").

The statute defines "serious harm" to mean "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious ... to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 93 (2d Cir. 2019) (quoting 18 U.S.C. § 1589(c)(2)). The statute also defines "[a]buse or threatened abuse of law or legal process" to mean "the use or threatened use of a law or legal process ... in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." *Id.* (quoting 18 U.S.C. § 1589(c)(1)).

In applying § 1589(c)(2), the Second Circuit has explained that "[w]hether an employer's threatened consequences are 'legitimate' and therefore do not qualify as 'serious harm' will depend on the 'surrounding circumstances' in each case." *United States v. Zhong*, 26 F.4th 536, 550 (2d Cir. 2022) (stating "[w]hether an employer's threatened consequences are 'legitimate' and therefore do not qualify as 'serious harm' will depend on the 'surrounding circumstances' in each case"). The Second Circuit has also rejected the categorical premise that the consequences of a "voluntarily entered into employment agreement" are always legitimate and cannot amount to serious harm. *Id.* (stating the defendant "offers no support for his implicit assumption that the consequences of a 'voluntarily entered into employment agreement' are always legitimate and can never amount to serious harm").

The Defendants argue that the Plaintiffs' allegations describe wage-and-hour disputes and the structure of the H-2A program, not coercion sufficient to state a forced labor claim. Defs.' Reply, ECF No. 45, at 1–3 (stating Plaintiffs' claims are "calculated to attract headlines" and that the Amended Complaint does not cure "the central issue of 'forced labor' or 'serious harm.'"). Defendants rely on authority cautioning that "not all bad employer-employee relationships or even bad employer-immigrant . . . relationships will constitute forced labor." *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011).

The Plaintiffs respond that the Defendants "systematically abused the H-2A program" to render Plaintiffs "so economically vulnerable that they had no choice but to continue laboring," including through movement restrictions, delayed payment, forced vacations, kickbacks, and immigration-linked threats. Pls.' Opp., ECF No. 41, at 1–4 (alleging Defendants "systematically abused the H-2A program" and describing a pattern of practices that "aimed to severely exacerbate Plaintiffs' economic precarity").

The Court agrees.

At this stage, the Plaintiffs have pleaded "factual content that allows the court to draw the reasonable inference" of liability. *Iqbal*, 556 U.S. at 678 (stating that a claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The Amended Complaint must therefore include more than "labels and conclusions," because "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (stating that "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

8

Here, the Amended Complaint plausibly alleges a § 1589 claim because it pleads facts supporting multiple statutory pathways and ties those allegations to the "surrounding circumstances" that inform the "serious harm" analysis. *Zhong*, 26 F.4th at 550 (stating "[w]hether an employer's threatened consequences are 'legitimate' and therefore do not qualify as 'serious harm' will depend on the 'surrounding circumstances' in each case"). The Plaintiffs are not required to allege physical force because § 1589(a) is structured in the disjunctive and "any one of" the enumerated means, standing alone, can violate the statute. *Pollok*, 139 F.4th at 138 (explaining the Government "was not required to prove a 'showing of force' " because " 'any one of' the enumerated types of conduct ... standing alone would violate Section 1589"); *see also Pagurigan v. Prompt Nursing Employment Agency, LLC*, 286 F.Supp.3d 430, 439 (EDNY 2017)("The TVPA does not require that plaintiffs be kept under literal lock and key. Rather, the fundamental purpose of § 1589 is to reach cases of servitude achieved through nonviolent coercion – namely serious harm, the threat of serious harm, or the abuse or threatened abuse of legal process.")(citations and internal quotation marks omitted).

The Plaintiffs allege that two supervisors "acted as agents for all Defendants" and supervised Plaintiffs' work at Casertano properties. Am. Compl., ECF No. 30, ¶ 51, at 11 (alleging Supervisors Reyes and Serrato "acted as agents for all Defendants."). The Plaintiffs also allege those supervisors' "job responsibilities included . . . collecting payments from H-2A employees." Am. Compl., ECF No. 30, ¶ 52, at 11–12 (alleging responsibilities included "collecting payments from H-2A employees."). These allegations are not framed as abstract conclusions, but as actor-specific conduct supporting a plausible inference of an alleged "scheme, plan, or pattern" under § 1589(a)(4). *Pollok*, 139 F.4th at 138 (quoting § 1589(a)(4) as

9

"any scheme, plan, or pattern intended to cause the person to believe" nonperformance would result in "serious harm or physical restraint").

The Plaintiffs also plead facts supporting an immigration-linked coercion theory. They allege that the Defendants "created an atmosphere of fear" by threats of termination and nonrenewal, and that, because "H-2A workers' lawful immigration status is specifically tied to their employer," those threats "carried the additional implicit threat of withdrawing workers' H-2A status, exposing them to the threat of deportation." Am. Compl., ECF No. 30, ¶ 88, at 19 (alleging threats "carried the additional implicit threat" of withdrawing status and "the threat of deportation").

At the pleading stage, a coercion theory tied to deportation risk may plausibly fall within § 1589(a)(3) and (a)(4) because " '[a]buse or threatened abuse of law or legal process' " includes "the use or threatened use of a law or legal process ... for any purpose for which the law was not designed, in order to exert pressure." *Adia*, 933 F.3d at 93 (quoting 18 U.S.C. § 1589(c)(1)). And in that same context, the Second Circuit has recognized that an immigration-status threat can plausibly support an inference of coercion when, "viewed in light of the surrounding circumstances," it "plausibly supports an inference" that a worker could regard it "as a threat to expose him to deportation." *Id.* at 93–94 (stating the alleged threat "plausibly supports an inference" that the worker could regard it "as a threat to expose him to deportation"). Plaintiffs' allegations therefore fit within the statutory definitions and the Second Circuit's approach to assessing coercion under all the same circumstances. *Adia*, 933 F.3d at 93 (quoting § 1589(c)(2) as requiring assessment of harm that is sufficiently serious "to compel a reasonable person of the same background and in the same circumstances").

10

The Plaintiffs also plead facts supporting restrictions on movement and isolation, including that supervisors "prohibited" workers from leaving housing "without their explicit permission," and that workers "generally did not leave" because they "feared repercussions," including "being deported." Am. Compl., ECF No. 30, ¶¶ 104, 107, at 21–22 (alleging supervisors "prohibited" leaving without "explicit permission," and workers "generally did not leave" due to fear of "being deported"). These allegations support a plausible inference of nonviolent coercion when considered together with the immigration-linked allegations and the alleged payment-related practices that Plaintiffs characterize as exacerbating "economic vulnerability." Pls.' Opp., ECF No. 41, at 1–4 (describing practices that "aimed to severely exacerbate Plaintiffs' economic precarity").

At the same time, the Court is mindful of the Defendants' reliance on the caution that "not all bad employer-employee relationships or even bad employer-immigrant . . . relationships will constitute forced labor." *Dann*, 652 F.3d at 1170. Taking Plaintiffs' factual allegations as pleaded, the Amended Complaint alleges more than a generalized claim of a poor employment relationship. *Twombly*, 550 U.S. at 555 (stating "a formulaic recitation of the elements of a cause of action will not do."). It alleges a constellation of practices that, if proven, could support a finding that Defendants obtained labor through "serious harm" or a "scheme, plan, or pattern" designed to compel continued labor. *Pollok*, 139 F.4th at 138 (quoting § 1589(a)(2) and (a)(4)); *Adia*, 933 F.3d at 93 (quoting § 1589(c)(2) as including "psychological, financial, or reputational harm").

And although the Defendants argue that Plaintiffs allege "only financial harm," Defs.' Reply, ECF No. 45, at 2 (stating that "[n]o physical, psychological, or reputational harm is alleged; only financial harm is asserted in the Complaint."), the statute expressly includes

11

"financial" harm within the definition of "serious harm." *Adia*, 933 F.3d at 93 (quoting §

1589(c)(2) to include "financial ... harm"). In addition, the Second Circuit has rejected the

categorical premise that consequences arising from a "voluntarily entered into employment

agreement" can never amount to serious harm. *Zhong*, 26 F.4th at 550 (stating the defendant

"offers no support for his implicit assumption" that such consequences "are always legitimate

and can never amount to serious harm"). For these reasons, the Amended Complaint plausibly

states a forced-labor claims.

Accordingly, the Plaintiffs' forced labor claim under 18 U.S.C. § 1589 will not be

dismissed at this stage.

### B. The 18 U.S.C. § 1589(a)(3) Abuse of Law or Legal Process Claim

The TVPA, under Section 1589, also prohibits "knowingly provid[ing] or obtain[ing] the

labor or services of a person" through enumerated means, including "by means of the abuse or

threatened abuse of law or legal process." *Adia*, 933 F.3d at 93 (quoting 18 U.S.C. § 1589(a)

(providing that a person violates § 1589 when he "knowingly provides or obtains the labor or

services of a person" "(3) by means of the abuse or threatened abuse of law or legal process")).

The statute defines "abuse or threatened abuse of law or legal process" to mean "the use or

threatened use of a law or legal process . . . in any manner or for any purpose for which the law

was not designed, in order to exert pressure on another person to cause that person to take some

action or refrain from taking some action." *Id.*

At the pleading stage, the Second Circuit has held that threats tied to immigration

sponsorship can plausibly constitute abuse of legal process where, "viewed in light of the

surrounding circumstances," the alleged statement "plausibly supports an inference" that the

worker "was entitled to regard it as a threat to expose him to deportation." *Adia*, 933 F.3d at 93–

12

94 (stating that, "[i]n the context of Adia's circumstances," the alleged threat to cancel sponsorship "constitutes abuse of legal process for purposes of subsection 1589(a)(3)," and explaining that the statement "plausibly supports an inference that Adia was entitled to regard it as a threat to expose him to deportation")).

The Second Circuit also has emphasized that § 1589(a)'s listed means are alternatives, and that proof of physical force is not required where the plaintiff proceeds under a non-force theory such as abuse of legal process. *Pollok*, 139 F.4th at 137–38 (explaining that "the plain text of the statute expressly provides that 'any one of' the enumerated types of conduct, such as threatening serious harm or abuse of legal process, standing alone would violate Section 1589," and explaining that "the listed types of conduct are structured in the disjunctive")).

Consistent with the statutory definition, other courts of appeals have described an (a)(3) theory as requiring proof that the defendant used law or legal process "in [a] manner or for [a] purpose for which it was not designed," did so "in order to exert pressure" on the worker to provide labor, and obtained the worker's labor "by means of" the pressure created by that abuse. *Martínez-Rodríguez v. Giles*, 31 F.4th 1139, 1150 (9th Cir. 2022) (stating that workers needed to prove the farm used law or legal process "in [a] manner or for [a] purpose for which it was not designed," did so "in order to exert pressure" on workers to provide labor, and obtained workers' labor "by means of" the pressure created by that abuse)).

Finally, although a "threat to cancel [immigration] sponsorship" can "constitute[ ] abuse of legal process," the plaintiff must plausibly allege that the defendant used the "law or legal process in a manner or for a purpose for which it was not designed," and must plausibly allege that the defendant acted "knowingly." *Anora*, 2023 WL 2307180, at *12–13 (stating that "a 'threat to cancel [immigration] sponsorship [can] constitute[ ] abuse of legal process for the

13

purposes of subsection 1589(a)(3),'" but stating that "the plaintiff must demonstrate that the defendant used the 'law or legal process in a manner or for a purpose for which it was not designed,'" and stating that § 1589(a)(3) "requires proof that the defendant 'knowingly' abused the law or legal process as a means to coerce the victim to provide labor or services against her will")).

The Plaintiffs invoke the statutory definition of "abuse or threatened abuse of law or legal process," which means using or threatening to use "a law or legal process . . . in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." Pls.' Opp'n, ECF No. 41, at 17 (quoting *Adia*, 933 F.3d at 93, quoting 18 U.S.C. § 1589(c)(1)).

The Defendants argue that Plaintiffs' "abuse of process" theory improperly treats required H-2A notices as coercion, and that notifying workers of the duty to depart is "absolutely not 'abuse of the legal process' but, rather, compliance with the explicit requirements of the legal process." Defs.' Reply, ECF No. 45, at 4 (stating notice is "absolutely not 'abuse of the legal process'" and is "compliance with the explicit requirements of the legal process.").

The Plaintiffs respond that the Defendants used the H-2A program and immigration enforcement risk as leverage within a broader coercive environment. Pls.' Opp., ECF No. 41, at 1–2 (alleging Defendants used "abuse of the legal processes of the H-2A program and the immigration enforcement system" to compel labor).

The Court agrees in part, and disagrees in part.

The Defendants cite the H-2A regulation providing: "The employer must inform H-2A workers of the requirement that they leave the United States" upon separation or the end of the certified period. Defs.' Reply, ECF No. 45, at 3 (quoting 20 C.F.R. § 655.135(i)(1) ("must

inform H-2A workers of the requirement that they leave the United States")). To the extent the Plaintiffs' § 1589(a)(3) theory rests solely on that mandated notice, the Defendants' argument has merit  because such notice reflects a "purpose for which the law was . . . designed." Defs.' Reply, ECF No. 45, at 4 (stating that notifying workers and reporting terminations "is the exact purpose for which those laws were designed."). That is consistent with the statutory definition, which focuses on "the use or threatened use of a law or legal process . . . for any purpose for which the law was not designed." *Adia*, 933 F.3d at 93 (quoting 18 U.S.C. § 1589(c)(1).

But the Plaintiffs' allegations are not limited to required notice. The Plaintiffs plead that the Defendants created an "atmosphere of fear" through threats tied to visa-dependent status. Am. Compl., ECF No. 30, ¶ 88, at 19 (alleging threats "carried the additional implicit threat of withdrawing workers' H-2A status, exposing them to the threat of deportation"). The Plaintiffs also plead that supervisors "instructed some Plaintiffs to lie to investigators about payments made to supervisors" and other practices. Am. Compl., ECF No. 30, ¶ 149, at 30 (alleging supervisors "instructed some Plaintiffs to lie to investigators about payments made to supervisors").

Taking these allegations as true at this stage, *Iqbal*, 556 U.S. at 678 (stating that "[the court] must take all of the factual allegations in the complaint as true"), and drawing all reasonable inferences in Plaintiffs' favor, *Cohen*, 711 F.3d at 359 (stating that the court "draws all inferences in the plaintiff's favor"), the Plaintiffs plausibly plead an (a)(3) theory extending beyond compliance and alleging immigration-linked leverage deployed in order to exert pressure. Defs.' Reply, ECF No. 45, at 4.

These allegations, taken as true, also align with *Adia*'s pleading-stage framing of immigration-linked threats "viewed in light of the surrounding circumstances." *Adia*, 933 F.3d at

93–94 (explaining that, "[i]n the context of Adia's circumstances," the alleged threat "constitutes abuse of legal process for purposes of subsection 1589(a)(3)," and stating that the statement "plausibly supports an inference" the worker "was entitled to regard it as a threat to expose him to deportation")). And while the Defendants emphasize the absence of physical restraint, § 1589(a) does not require proof of force where the claim proceeds under an enumerated non-force means such as abuse of legal process. *Pollok*, 139 F.4th at 137–38 (explaining that "any one of" the listed means "standing alone would violate Section 1589," and explaining that "the listed types of conduct are structured in the disjunctive")).

To be sure, the Plaintiffs ultimately must prove that the Defendants used the relevant law or legal process "for [a] purpose for which it was not designed," that the use was "in order to exert pressure," and that the Defendants obtained Plaintiffs' labor "by means of" the pressure created by that alleged abuse. *Martínez-Rodríguez*, 31 F.4th at 1150 (stating that workers needed to prove use "for [a] purpose for which it was not designed," use "in order to exert pressure," and labor obtained "by means of" the pressure created by that abuse)). The Plaintiffs also ultimately must prove that the Defendants acted "knowingly." *Anora*, 2023 WL 2307180, at *12–13 (stating that § 1589(a)(3) "requires proof that the defendant 'knowingly' abused the law or legal process as a means to coerce the victim to provide labor or services against her will")). At the motion to dismiss stage, however, the Plaintiffs have plausibly alleged more than mere compliance with required notice, and have instead alleged immigration-linked threats and related conduct used "in order to exert pressure." Defs.' Reply, ECF No. 45, at 4 (quoting 18 U.S.C. § 1589(c)(1) and "in order to exert pressure").

Accordingly, Plaintiffs' claim under 18 U.S.C. § 1589(a)(3) will not be dismissed at this stage, but it will be construed to exclude any theory premised solely on providing notice required by 20 C.F.R. § 655.135(i).

### C.    The Connecticut Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

Under Connecticut law, "[i]t is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Geysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 399, 142 A.3d 227, 238 (2016) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, *269 Conn.* 424, 432–33, 849 A.2d 382 (2004)). "In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Id.* (quoting *De La Concha*, 269 Conn. at 432–33). The covenant "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Id.* (quoting *De La Concha*, 269 Conn. at 432–33). And "[t]o constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Id.* at 399–400, 142 A.3d at 238 (quoting *De La Concha*, 269 Conn. at 433).

In Connecticut, the implied covenant claim requires a contract between the parties. *See Szynkowicz v. Bonauito-O'Hara*, 170 Conn. App. 213, 223, 154 A.3d 61, 68 (2017) (quoting *Macomber v. Travelers Prop. & Cas. Corp.*, *261 Conn. 620, 638, 804 A.2d 180* (2002)) ("the existence of a contract between the parties is a necessary antecedent to any claim of breach of the [covenant] of good faith and fair dealing"). Consistent with that rule, "a person cannot be held

liable for breach of the implied covenant of good faith and fair dealing without being a party to a contract." *Bruno v. Whipple*, 138 Conn. App. 496, 510, 54 A.3d 184, 194 (2012) ("the plaintiff concedes, as she must, that a person cannot be held liable for breach of the implied covenant of good faith and fair dealing without being a party to a contract"); accord *Szynkowicz*, 170 Conn. App. at 224, 154 A.3d at 69 (quoting *Bruno*, 138 Conn. App. at 510) ("a person cannot be held liable for breach of the implied covenant of good faith and fair dealing without being a party to a contract").

Defendants argue that this claim should be dismissed for two reasons. First, Defendants argue that Plaintiffs "fail to allege that the termination of their seasonal employment violated an important public policy." Defs.' Reply at 7-8 ("The Court should dismiss Count Seven for two simple reasons: because Plaintiffs fail to allege that the termination of their seasonal employment violated an important public policy . . . ."). In support, Defendants rely on the wrongful-discharge line of cases and further argue that Plaintiffs have "adequate statutory remedies for their claims." *Id.* Second, Defendants argue that the claim must be dismissed as to Lawrence Williams, John Casertano, and N. Casertano Greenhouses & Farms, Inc. because "such claims may not be asserted against entities who are not parties to the contract." Defs.' Mem. at 19 ("It is 'settled law' in Connecticut that such claims may not be asserted against entities who are not parties to the contract.").

Plaintiffs respond that they "sufficiently plead claims for breach of contract and breach of the implied covenant of good faith and fair dealing against all Defendants," Pls.' Opp'n at 29 ("Defendants do not contest that Plaintiffs sufficiently state a claim against Manzana with respect to Plaintiffs' contract claims (Counts 6, 7, and 8),and Defendants only argue that Plaintiffs cannot bring contract claims as to the other three Defendants: Williams, Casertano, and

18

NCGFI."). Plaintiffs further argue that they "have sufficiently alleged facts to establish these claims against the remaining Defendants as well," because "[t]he Casertano Defendants are liable for the contract claims because they are joint employers with Manzana and Williams." *Id.* ("But Plaintiffs have sufficiently alleged facts to establish these claims against the remaining Defendants as well."; "The Casertano Defendants are liable for the contract claims because they are joint employers with Manzana and Williams."). Plaintiffs also argue that Williams is liable because he "is a joint employer" and because the Amended Complaint alleges facts sufficient to "pierce the corporate veil as to Williams." *Id.* at 32–36.

The Court agrees.

Taking the allegations in the Amended Complaint as true and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs plausibly state a claim for breach of the implied covenant of good faith and fair dealing. Plaintiffs allege that they "and Defendants were parties to the H-2A contract under which Plaintiffs and members of the proposed Class reasonably expected to receive the benefits guaranteed by the H-2A program regulations," that "[d]efendants' actions have impeded the rights of Plaintiffs and members of the proposed Class to receive benefits that they reasonably expected to receive under their H-2A contracts," and that "[d]efendants acted in bad faith when injuring the rights of Plaintiffs and members of the proposed Class to receive benefits they reasonably expected to receive under their contracts." Am. Compl. ¶¶ 335–337.

Plaintiffs further allege that Defendants "were at all times aware of their obligations as H-2A program employers," that Defendants "have a general business practice of acting intentionally to create terms and conditions of employment which contradict the H-2A contract and violate the H-2A regulations incorporated therein," and that Defendants "acted in bad faith

19

and violated the implied covenant of good faith and fair dealing in the performance of their duties" by "intentionally failing to reimburse Plaintiffs and members of the proposed Class for inbound and outbound transportation and subsistence costs," by "charging Plaintiffs and members of the proposed Class an unlawful kickback at the end of each season," by "failing to pay Plaintiffs and members of the proposed Class overtime compensation during workweeks in which they were not employed in agriculture," by "failing to provide adequate housing," and by "forcing Plaintiffs and members of the proposed Class to take a one-month unpaid vacation every year." *Id.* ¶¶ 338, 342–345. Plaintiffs also allege that, "[a]s a direct cause of Defendants' bad faith, Plaintiffs and members of the proposed Class have suffered loss and damages." *Id.* ¶ 346.

These allegations are sufficient at this stage to plead that Defendants impeded Plaintiffs' right to receive "benefits that [they] reasonably expected to receive under the contract" and did so in "bad faith." *Geysen*, 322 Conn. at 399–400, 142 A.3d at 238 (quoting *De La Concha, 269 Conn. at 433*) ("the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith"). As pleaded, this claim is not limited to a wrongful-discharge theory. Defs.' Reply at 8 (arguing that the claim fails because Plaintiffs have not alleged that "the termination of their seasonal employment violated an important public policy." It is a contract claim that focuses on "the fulfillment of the parties' reasonable expectations rather than on a violation of public policy." *Geysen*, 322 Conn. at 404, 142 A.3d at 240 ("the former focuses on the fulfillment of the parties' reasonable expectations rather than on a violation of public policy"). Indeed, under Connecticut law, "termination is incidental, or a means, to accomplish the breach of the implied covenant of good faith and fair dealing." *Id.* at 404 n.13, 142 A.3d at 240 n.13. Because Plaintiffs

20

allege bad-faith interference with their contractual rights and benefits under the H-2A contracts, rather than a stand-alone wrongful-discharge claim, the authorities on which Defendants rely, ones involving termination-based public-policy claims, do not require dismissal at this stage.

As to Williams, Casertano, and N. Casertano Greenhouses & Farms, Inc., while Defendants are correct that Connecticut law does not permit an implied-covenant claim against a nonparty to the contract. Defs.' Mem. at 18 ("It is 'settled law' in Connecticut that such claims may not be asserted against entities who are not parties to the contract."); *Bruno*, 138 Conn. App. at 510, 54 A.3d at 194 ("a person cannot be held liable for breach of the implied covenant of good faith and fair dealing without being a party to a contract"); *Szynkowicz*, 170 Conn. App. at 224, 154 A.3d at 69 ("[t]he plaintiff's breach of contract and breach of the covenant of good faith and fair dealing counts indisputably rest on the allegation that the defendant was a party to the dual agency agreement to create the required privity of contract"), Plaintiffs specifically allege, however, that "[f]or each year that a Plaintiff worked for Defendants, an enforceable contract existed between that Plaintiff on the one hand and all Defendants on the other," that "[d]efendant Manzana executed all H-2A contracts relevant to this action," and that "[a]ll other Defendants are jointly and severally liable on each contract because all other Defendants are joint employers of Plaintiffs." Am. Compl. ¶¶ 323, 325–326. At the motion to dismiss stage, those allegations are sufficient to permit the claim to proceed against all Defendants.

Accordingly, the Plaintiffs' Connecticut claim for breach of the implied covenant of good faith and fair dealing will not be dismissed at this stage.

### D. Connecticut Tort Claims: Conversion and Statutory Theft (Kickbacks)

"Conversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab, Inc. v.*

*Auctions Worldwide, LLC*, 284 Conn. 408, 418, 934 A.2d 227 (2007).  The Connecticut Appellate Court has applied the same definition. *Coster v. DuQuette*, 119 Conn. App. 827, 831–32, 990 A.2d 362 (2010) (quoting that "[t]he tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights"). To establish a prima facie case of conversion, "the plaintiff had to demonstrate that (1) the material at issue belonged to the plaintiff, (2) that [the defendant] deprived the plaintiff of that material for an indefinite period of time, (3) that [the defendant's] conduct was unauthorized and (4) that [the defendant's] conduct harmed the plaintiff." *News Am. Mktg. In–Store, Inc. v. Marquis*, 86 Conn. App. 527, 545, 862 A.2d 837 (2004) (stating the four elements); Defs.' Reply, ECF No. 45, at 9–10 (quoting the conversion standard).

"Statutory theft is the stealing of another's property or the knowing receipt and concealment of stolen property." *Mystic*, 284 Conn. at 418–19 (stating that "statutory theft is the stealing of another's property or the knowing receipt and concealment of stolen property"). Statutory theft "requires an element over and above what is necessary to prove conversion, namely, that the defendant intentionally deprived the complaining party of his or her property." *Id.* at 419 (stating that statutory theft "requires an element over and above what is necessary to prove conversion, namely, that the defendant intentionally deprived the complaining party of his or her property").

When the claim concerns money, Connecticut law recognizes that "money, not just tangible goods, may be the subject of conversion or statutory theft," but "a claim for money owed on a debt is not sufficient to establish such causes of action." *Id.* at 421. Thus, "in order to establish a valid claim of conversion or statutory theft for money owed, a party must show ownership or the right to possess specific, identifiable money, rather than the right to the

22

payment of money generally." *Id.* (stating that a plaintiff must show "ownership or the right to possess specific, identifiable money, rather than the right to the payment of money generally"); *Macomber v. Travelers Prop. & Cas. Corp.*, 261 Conn. 620, 650, 804 A.2d 180 (2002) (stating that "[a] plaintiff must establish legal ownership or right to possession in the particular thing, the specifically identifiable moneys, that the defendant is alleged to have converted"); *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 772, 905 A.2d 623 (2006) (stating that "[a] mere obligation to pay money may not be enforced by a conversion action").

The Plaintiffs argue that they are not suing to collect a contractual debt, but instead allege an unauthorized taking of kickback payments collected from H-2A workers by Supervisors Reyes and Serrato, who allegedly "acted as agents for all Defendants" and whose job responsibilities included "collecting payments from H-2A employees." Am. Compl., ECF No. 30, ¶¶ 51–52, at 11–12.

The Defendants contend these claims must be dismissed at the pleading stage because Plaintiffs have not alleged "specifically identifiable moneys" and instead assert tort claims premised on an alleged breach of an employment contract, including a theory that Defendants are "vicariously liable" for employees' alleged collection of kickbacks. Defs.' Reply, ECF No. 45, at 10.

The Court disagrees.

The Plaintiffs plead that the Defendants "demanded" "kickback payments for hundreds of dollars as a condition for being recruited" and referred to these payments as "agradecimientos." Am. Compl., ECF No. 30, ¶ 133, at 27 (alleging Defendants "demanded" "kickback payments for hundreds of dollars" and used the term "agradecimientos."). The Plaintiffs also plead that two supervisors "acted as agents for all Defendants" and that their "job responsibilities included . . .

23

collecting payments from H-2A employees." Am. Compl., ECF No. 30, ¶¶ 51–52, at 11–12 (alleging supervisors "acted as agents for all Defendants" and that responsibilities included "collecting payments from H-2A employees.").

Taking these allegations as true at this stage, *Iqbal*, 556 U.S. at 678 (stating that "[the court] must take all of the factual allegations in the complaint as true") and drawing all reasonable inferences in Plaintiffs' favor, *Cohen*, 711 F.3d at 359 (stating that the court "draws all inferences in the plaintiff's favor"), the Plaintiffs plausibly allege an unauthorized taking and exercise of control over Plaintiffs' money sufficient to state conversion. *Mystic*, 284 Conn. at 418 (stating that conversion is an "unauthorized assumption and exercise of the right of ownership over property belonging to another"); *News America*, 86 Conn. App. at 545 (requiring allegations that the material "belonged to the plaintiff," that defendants deprived plaintiffs of it "for an indefinite period of time," that the conduct was "unauthorized," and that it "harmed the plaintiff").

The Defendants' "specifically identifiable moneys" argument does not warrant dismissal on the pleadings. Connecticut law distinguishes between an impermissible attempt to convert "money owed on a debt" and a claim alleging a deprivation of "specific, identifiable money." *Mystic*, 284 Conn. at 421 (stating that "a claim for money owed on a debt is not sufficient," and requiring "specific, identifiable money"); *Macomber*, 261 Conn. at 650 (stating that a plaintiff must establish a right to possession in "the specifically identifiable moneys"). The Plaintiffs' allegations do not frame the claim as a failure to pay wages owed under a contract, but as an alleged scheme in which supervisors "collect[ed] payments from H-2A employees" and Defendants "demanded" "kickback payments for hundreds of dollars." Am. Compl., ECF No. 30, ¶¶ 52, 133, at 11–12, 27. At this stage, those factual allegations contain sufficient "factual

24

content" to "allow[] the court to draw the reasonable inference" of liability, *Iqbal*, 556 U.S. at 678 (stating that a claim is plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable"), rather than a "mere obligation to pay money," *Deming*, 279 Conn. at 772 (stating that "[a] mere obligation to pay money may not be enforced by a conversion action").

For similar reasons, the Plaintiffs plausibly plead statutory theft. Statutory theft requires "an element over and above what is necessary to prove conversion," namely, that the defendant "intentionally deprived the complaining party of his or her property." *Mystic*, 284 Conn. at 419 (stating the additional intent element). The Plaintiffs' allegations that Defendants "demanded" kickbacks "as a condition for being recruited," and that supervisors' responsibilities included "collecting payments," plausibly support an inference of intentional deprivation at this stage. Am. Compl., ECF No. 30, ¶¶ 52, 133, at 11–12, 27; *Iqbal*, 556 U.S. at 678 (stating that plausibility requires "factual content" permitting a "reasonable inference" of liability).

Accordingly, the Plaintiffs' conversion and statutory theft claims under Connecticut law will not be dismissed at this stage.

## IV.    CONCLUSION

For the reasons stated above, the Defendants' Renewed Motion to Dismiss Plaintiffs' Amended Complaint, ECF No. 36, is **GRANTED IN PART** and **DENIED IN PART**.

The motion is **GRANTED** only to the limited extent that the Plaintiffs' claim under 18 U.S.C. § 1589(a)(3) is construed to exclude any theory premised solely on the Defendants' providing notice required by 20 C.F.R. § 655.135(i).

25

The motion is otherwise **DENIED**, including as to the Plaintiffs' forced labor claim under 18 U.S.C. § 1589, Plaintiffs' abuse of law or legal process theory under 18 U.S.C. § 1589(a)(3) as construed, the Connecticut breach of the implied covenant of good faith and fair dealing claim, and Plaintiffs' Connecticut-law conversion and statutory theft claims.

SO ORDERED at New Haven, Connecticut, this 13th day of March, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE